ERIC R. GLITZENSTEIN
(Pro Hac Vice Application Pending)
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C.  20016
(202) 588-5206
eglitzenstein@meyerglitz.com

NICK LAWTON
Oregon Bar No. 143685
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C.  20016
(202) 588-5206
nlawton@meyerglitz.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVISION**, <br><br> Plaintiff, <br><br> v. <br><br> **RYAN ZINKE,** Secretary, U.S. Department of the Interior; **GREG SHEEHAN**, Acting Director, U.S. Fish and Wildlife Service. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Endangered Species Act citizen's suit, 16 U.S.C. § 1540(g), and Administrative Procedure Act case, 5 U.S.C. § 706 |

1.      Plaintiff Center for Biological Diversity (the "Center") challenges two related

decisions under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA" or "Act"), by the

U.S. Department of the Interior ("DOI") and the U.S. Fish and Wildlife Service ("FWS" or "the

1

Service") pertaining to a critically imperiled Pacific Northwest songbird, the streaked horned lark (*Eremophila alpestris strigata*) (hereafter "lark").  First, Plaintiffs challenge the Service's decision to list the lark as "threatened" rather than affording it the more protective status of "endangered."  An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6).  That is the situation facing the lark, which has been reduced to fewer than 1,600 birds scattered in small populations in Oregon and Washington.  The best available data reflect that the larks soon will be restricted to only about five percent of their historic range and that the tiny number of remaining larks face myriad threats to their continuing existence. Consequently, it was arbitrary and capricious, and otherwise contrary to the ESA, for the FWS to refuse to list the lark as endangered, and to instead afford the species the less protective threatened designation.

2.     The Center also challenges a "special" regulation issued by the FWS pursuant to section 4(d) of the Act.  Although the ESA generally prohibits the killing, harming, or other forms of "take" of species listed as endangered, *see* 16 U.S.C. § 1538(a)(1), section 4(d) provides that for species listed as threatened, the Service must issue regulations delineating which activities are prohibited, and such regulations must be "necessary and advisable to provide for the conservation of the species." 16 U.S.C. § 1533(d). However, rather than provide for the conservation of the lark, the section 4(d) rule adopted by the FWS authorizes activities that the Service itself found are detrimental to the species' continued existence, including the mowing, plowing, and burning of occupied lark habitat on agricultural lands during the nesting and breeding season.

3.      Pursuant to the ESA and Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), Plaintiffs request a remand of the decision refusing to protect larks as endangered, as well as vacatur and remand of the 4(d) rule.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to section 11(g) of the Endangered Species Act, 16 U.S.C. § 1540(g) and 28 U.S.C. § 1331 (federal question).

5.      Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), as this civil action is brought against officers and employees of the United States acting in their official capacities and under the color of legal authority, and a substantial part of the events giving rise to the claim occurred in this district.

6.      Pursuant to Local Rule 3-2(b), Divisional Venue is proper in the Portland Division because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this Division.  The Oregon Office of the U.S. Fish and Wildlife Service that is located in Multnomah County took the lead in drafting the listing proposals for the streaked horned lark as well as the 4(d) rule for the species.  In addition, the fact that the Pacific Regional Office of the FWS is located in Portland further supports venue in this Division. Streaked horned larks can be found in Oregon from islands in the Columbia River south through the Willamette Valley and occur in Clackamas, Polk, Washington, and Yamhill counties in the Portland Division.

## PARTIES

7.      The Center is a non-profit Internal Revenue Service Code Section 501(c)(3) corporation that is headquartered in Tucson, Arizona, with offices in various locations throughout the country, including Portland, Oregon.  The Center works through science, law, and

policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues. The Center has more than 63,000 members throughout the United States and the world, including more than 1,600 in Oregon.

8.      The Center brings this action on its own institutional behalf and on behalf of its members, who derive scientific, aesthetic, recreational, and spiritual benefits from streaked horned larks and their habitat. The Center has members that endeavor to observe streaked horned larks in the wild and have ongoing interests in the species and its habitat. The Center's members have concrete future plans to visit the birds' habitat and try to observe streaked horned larks in the wild. The interests of the Center and its members in observing, studying, and otherwise enjoying streaked horned larks and their habitat, and in obtaining and disseminating information regarding the survival of this species have been harmed, and will continue to be harmed, by Defendants' actions and would be redressed by the relief sought in this case.

9.      Defendant Ryan Zinke is the Secretary of the Department of the Interior and has ultimate statutory responsibility for implementing the ESA. Secretary Zinke is sued in his official capacity.

10.     Defendant Greg Sheehan is Acting Director of the U.S. Fish and Wildlife Service, a federal agency within the U.S. Department of the Interior that has been delegated primary authority for day-to-day administration of the ESA with respect to terrestrial species. Acting Director Sheehan is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

11.     Congress passed the ESA to "provide a program for the conservation of . . . endangered species and threatened species," and "provide a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978).

12. The ESA provides for the protection of species that are listed as "endangered" or "threatened." 16 U.S.C. § 1533. The Act defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range," and a threatened species as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. §§ 1532(6), (20).

11. The Service must list a species as endangered or threatened based on the presence of any one of five factors: the present or threatened destruction, modification, or curtailment of its habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting its continued existence. 16 U.S.C. §§ 1533(a)(1)(A)-(E).

12. The Service must determine whether the species is endangered or threatened "throughout all or a significant portion of its range." *Id*. §§ 1532(6), (20).

13. In making its listing determinations, the Service must use the "best scientific and commercial data available . . . ." 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b).

14. The listing of a species as "endangered" under the ESA triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, that apply to any "person," as broadly defined by the Act. *Id*. § 1532(13).

15. Among the prohibitions in Section 9 is the prohibition on "take." 16 U.S.C. § 1538(a)(1)(B). "Take" is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(18). "Harm" is

further defined to include significant habitat modification or degradation which "actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 17.3.

16.    The ESA's take provisions do not automatically apply to species listed as threatened. Rather, section 4(d) of the Act provides that the Service "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation" of threatened species, 16 U.S.C. § 1533(d), and that the Service "may" extend any of the prohibitions in Section 9 of the Act, including the take prohibition, to threatened species.  *Id.*

17.    The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." 16 U.S.C. § 1532(3).

18.    Shortly after the ESA was enacted, the Service exercised its authority under Section 4(d) by extending the prohibition on "take" in Section 9 of the ESA to all threatened species.  50 C.F.R. § 17.31(a); 40 Fed. Reg. 44,412, 44,414 (Sept. 26, 1975).  Consequently, unless the FWS adopts a section 4(d) rule that is tailored to a particular species, a species listed as threatened benefits from the same broad prohibition on unauthorized take as an endangered species.  *See* 50 C.F.R. § 17.31(c) ("[w]henever a special rule in §§ 17.40 to 17.48 applies to a

threatened species, none of the provisions of paragraphs (a) and (b) of this section will apply"
because the "special rule will contain all the applicable prohibitions and exceptions").

19.     The ESA provides that the FWS may, under specified circumstances, authorize
the take of endangered and threatened species that would otherwise be prohibited. Section 10
provides that for a take that is "incidental to, and not the purpose of, the carrying out of an
otherwise lawful activity," the Service may authorize the take when certain criteria are satisfied,
including that the permit applicant submits a "conservation plan" specifying "the impact which
will likely result from such taking" and "what steps the applicant will take to minimize and
mitigate such impacts . . . ." 16 U.S.C. §§ 1539(a)(1)(A), (a)(2)(A). Likewise, section 7 of the
Act establishes a mechanism whereby take of listed species may be authorized by the FWS when
a federal agency undertakes, funds, or authorizes an action that affects listed species. *Id*. § 1536.
The federal agency must "consult" with the FWS, and for actions that the FWS determines will
cause take but not jeopardize the continued existence of the species, the Service must "specif[y]
the impact of such incidental taking on the species" and "specif[y] those reasonable and prudent
measures that the [FWS] considers necessary or appropriate to minimize such impact." *Id*. §
1536(b)(4).

## FACTUAL BACKGROUND

### Streaked Horned Larks

19.     Found only in the Pacific Northwest, streaked horned larks  are small, ground-
dwelling songbirds with yellow faces and mostly brown bodies with a dark brown or black back,
a ruddy nape, and light colored underparts.

20.     Streaked horned larks are best known for their conspicuous feathered tufts that
appear as horns on their heads.



National Park Service Photograph

21.     Once common throughout the region, streaked horned larks were found in grasslands and prairies west of the Cascade Mountains from southern British Columbia through southern Oregon.  Today, streaked horned larks are extirpated from the San Juan Islands, northern Puget Sound, the Rogue and Umpqua Valleys in Oregon, and all of the species' former range in Canada.

22.     The species has already lost 90 percent of its historic range.

23.     Streaked horned larks prefer flat areas with sparse vegetation and the birds are generally found in open landscapes of 300 acres or more.  Historically, lark habitat was created and maintained by seasonal flooding, fires, and other natural processes.  Because of human interference with those processes and other forms of habitat destruction and degradation, at present lark habitat is most often created by human manipulation of the landscape, such as mowing, plowing, and burning.  In addition to prairies, grasslands, and coastal areas, the birds rely on maintained areas around airports and military bases, as well as fallow fields, grass fields, and barren areas in between agricultural fields.

24.     Adult larks eat grass and weed seeds and feed their young insects.

25.     Streaked horned larks nest in prairies, dunes, mudflats, estuaries, sandy beaches, sparsely vegetated grasslands, and similar habitat.  Nesting occurs from mid-April to August in

depressions in the ground lined with soft vegetation.  Streaked horned larks tend to return to their

natal nests each year and on average produce three eggs.

26.    The sparse remaining lark habitat is dwindling due to conversion to agriculture

and urban development, loss of natural disturbance regimes and resulting woody plant

encroachment, and incompatible management practices.  For example, when agricultural fields

are converted to vineyards or are used to produce crops such as blueberries or broccoli, they

cease to provide larks with habitat for breeding.  Loss and fragmentation of habitat, including

destruction of 98 percent of native grasslands on the West Coast, has caused drastic declines in

streaked horned lark populations.

27.    While habitat loss and fragmentation have decimated streaked horn lark numbers,

the birds face several other threats as well.  Streaked horned larks are imperiled by sources of

direct mortality events in their range.  Larks frequently use areas around airports, which are

routinely mowed and maintained.  Although these activities provide habitat for the larks,

mowing and ground maintenance at airports also crushes the birds, their young, and their nests

and causes adult birds to abandon their nests.  Larks may also be killed in collisions with aircraft.

28.    Streaked horned larks also use fallow or recently burned agricultural fields and

grass seed farms, but are subject to crushing, flushing, and nest loss from plows and other farm

vehicles.   Human recreational use of prairies, grasslands, and coastal areas used by larks also

results in trampling by people, dogs, and horses.  Lark habitat on islands in the Columbia River

is often created or maintained by dredge spoil dumping, but dredge spoil dumping can bury

nests, young, and/or adults and has resulted in lark mortality.

29.    Larks are also gravely imperiled by their extremely small population numbers and

associated genetic concerns.  Fewer than 1,600 streaked horned larks remain today, and these

birds are scattered in fragmented populations in Oregon and Washington.  Low nesting success

and lack of interchange between populations is leading to genetic bottlenecking, inbreeding, and

a lack of genetic viability, which make the species more vulnerable to extinction.

30.     Streaked horned larks in Washington occur on the South Puget Sound, on the

Washington coast, and on islands and dredge disposal sites in the lower Columbia River. In its

listing decision, the FWS found that the "total estimated population of streaked horned larks in

these areas is 270-310 birds"; that the population of larks in these areas "is declining by 40

percent per year"; and that an analysis of the best available data concluded that "streaked horned

larks in Washington "would likely become extirpated within 25 years."  78 Fed. Reg. at 61,498.

31.     The Willamette Valley in Oregon provides the only other occupied habitat for the

small and vulnerable population of larks. . The total population in the Willamette Valley is

estimated at only 900 to 1,300 birds, and the FWS has found that this small population is also

"declining," albeit at a somewhat slower pace than larks in Washington.  78 Fed. Reg. at 61,498.

32.     Very small populations of larks are at high risk of extinction from stochastic

events, i.e., future events such as extreme weather conditions or outbreaks of disease that will

likely occur but cannot be predicted with precision.  Because a majority of the remaining

streaked horned larks winter together primarily either in the Willamette Valley or on islands in

the Columbia River, they are extremely vulnerable to unpredictable but devastating events.

## The FWS's Proposed Listing and Section 4(d) Rules

33.     The Service first considered the lark as a candidate for ESA listing in 2001.  *See*

66 Fed. 54,808 (Oct. 30, 2001).  In 2002, the Center and other conservation groups formally

petitioned the Service to protect streaked horned larks under the ESA.

34.     In 2006, the FWS assigned the lark a "listing priority number" of 3, which meant that the Service believed that the lark faced "imminent threats of a high magnitude . . . ." 78 Fed. Reg. at 61,453; *see also* 71 Fed. Reg. 53,756 (Sept. 12, 2006).  Nonetheless, the Service failed to take any action at that time or for the next several years to proceed with listing of the lark.

5.     As a result of a 2011 settlement agreement between the Center and the Service requiring the agency to make decisions on whether to list a number of species, the FWS committed to a timetable for either proceeding with listing of the lark or determining that such listing was unwarranted.

36.     On October 11, 2012, the FWS formally proposed protecting the lark under the ESA.  *See* 77 Fed. Reg. 61,938 (Oct. 11, 2012).  The Service explained that, although the lark's breeding range historically extended from southern British Columbia to southwestern Oregon and the species was  "described as a common summer resident" and "abundant" in various locations throughout this range, the "lark has been extirpated as a breeding subspecies throughout much of its range, including all of its former range in British Columbia, the San Juan Islands, the northern Puget Trough, the Washington coast north of Grays Harbor, the Oregon coast, and the Rogue and Umpqua Valleys in southwestern Oregon."  *Id*. at 61,946-97.  The Service further explained that the lark's "range has contracted from both the north and the south simultaneously" and that the total population has been reduced to "about 1,170-1,610 individuals" in a handful of locations in Oregon and Washington.  *Id*. at 61,948.

37.     The Service's proposal explained that the "current range of the streaked horned lark can be divided into three regions: (1) The south Puget Sound in Washington; (2) the Washington coast and lower Columbia River islands (including dredge spoil deposition sites near the Columbia River in Portland, Oregon); and (3) the Willamette Valley in Oregon."  77 Fed.

Reg. at 61,947.  The proposal described the lark's status in the Washington and Columbia River portions of the species' range in particularly dire terms, explaining that the "population is declining precipitously," with one study "estimat[ing] that the population of streaked horned larks was declining by 40 percent per year" and another study "conclud[ing] that there is a high probability of south Puget Sound population loss in the future given the low estimates of fecundity and adult survival along with emigration out of the Puget Sound."  *Id*. at 61,948.  The proposal stated that "[w]e do not have population trend data in Oregon that is comparable to the study in Washington," but explained that there are only "about 900 – 1,300 breeding streaked horned larks in the Willamette Valley," with the largest known population breeding at the Corvallis Municipal Airport, where mowing and other activities designed to facilitate airport operations also create suitable lark habitat but place larks at risk of collision with aircraft.  *Id*.

38.    The FWS's proposed listing rule set forth myriad threats to the lark.  In addition to the fact that "subspecies may disappear from [the south Puget Sound of Washington] in the near future," the Service explained that there are "many other ongoing threats to the streaked horned lark's habitat throughout its range, including: (1) Conversion to agriculture and industry; (2) loss of natural disturbance processes such as fire and flooding; (3) encroachment of woody vegetation; (4) invasion of coastal areas by nonnative beachgrasses; and (5) incompatible management practices."  77 Fed. Reg. at 61,955.  In addition, the FWS stated that "[b]ecause the populations of streaked horned larks are declining and small, we find that [the] effect of the threat of predation is resulting in a significant impact on the species," *id*. at 61,957; that in the absence of ESA listing "existing regulatory mechanisms are not adequate to reduce the threats . . . [to the] streaked horned lark now or in the future," including because "[m]ost of the sites used by streaked horned larks require management to maintain the low vegetative structure and

open landscape needed by streaked horned larks, although few of the streaked horned lark's

breeding or wintering habitats are managed for the conservation of the species," *id*. at 61,962,

61,969; and that the "small, isolated nature of the remaining populations of . . . streaked horned

lark increases the species' vulnerability to stochastic (random) natural events" because a

"population's small, isolated nature . . . substantially increase[s] the of extirpation from the

effects of all other threats, including those addressed in this analysis, and those that could occur

from unknown sources."  *Id*. at 61,965.  The FWS further found that "[g]enetic analysis has

shown that streaked horned larks have suffered a loss of genetic diversity due to a bottleneck in

population size [], the effect of which may be exacerbated by continued small population size."

*Id*. at 61,967.

      39.    Despite painting a bleak picture of the lark's current status and myriad threats to

its continued existence, the FWS proposed to list the lark as threatened rather than endangered.

According to the Service's proposal, a threatened listing was justified because, although the best

available science reflects that the "streaked horned larks in Washington would likely become

extinct within 25 years," the "population of streaked horned larks in the Willamette Valley of

Oregon appears to be more stable . . . [a]lthough streaked horned larks in the Willamette Valley

face many of the same threats as populations in Washington," including "small population size,

and likely loss of habitat to future development and incompatible management practices . . . ."

77 Fed. Reg. at 61, 970.  In addressing whether the anticipated loss of the Washington portion of

the lark's range in the foreseeable future means that the lark must at least be considered to be

endangered in a "significant portion of its range," 16 U.S.C. § 1532(6), the FWS stated that it

had "considered whether threats may be so concentrated in some portion of its range that, if that

portion were lost, the entire subspecies would be in danger of extinction."  77 Fed. Reg. at

61,970-71.  In applying that test, the FWS "determined that even with the potential loss of the Washington populations, the relatively larger, more stable population in the Willamette Valley would likely persist," although, at the same time, the Service acknowledged that the "threats to streaked horned larks in Washington and Oregon are apparently similar in nature" and that, "[i]n winter, most of the subspecies congregates in the Willamette Valley, putting it at risk of stochastic events in bad weather years."  *Id*. at 61,969-71.

40.     In its proposal, the FWS set forth a non-exclusive list of activities that would potentially result in a violation of the ESA's take prohibition if the lark received the "standard protections for threatened species in the Service's regulations," which provide that threatened species ordinarily benefit from the same prohibitions on take as endangered species.  77 Fed. Reg. at 61,972 (citing 50 C.F.R. § 17.31).  Among the activities identified by the Service that "could potentially result in a violation of section 9 of the Act" were the "[u]nauthorized modification of the soil profiles or the vegetation components on sites known to be occupied by . . . streaked horned larks" and the "[d]eposition of dredge materials on occupied streaked horned lark breeding habitats, intentional harassment of species at airports as part of a wildlife hazard reduction program, [and] mowing or burning of occupied species habitats during the breeding season."  77 Fed. Reg. at 61,972.

41.     Rather than apply the "standard protections for threatened species" to the lark, the FWS proposed a "special rule" that the Service asserted was "necessary and advisable to provide for the conservation of the species."  77 Fed. Reg. at 61,972.  The proposed special rule provided that "take of the streaked horned caused by restoration and maintenance activities either through agricultural operations or by airports on State, county, private or tribal lands would be exempt from section 9 of the Act."  *Id*.  The Service also "propose[d] to exempt certain normal farming

14

or ranching activities, including: grazing; routine fence and structure maintenance, mowing,

herbicide use, burning, and other routine activities" described in the proposed rule. *Id*.  The

FWS stated that the "rule targets these activities to encourage landowners to continue to maintain

those areas that are not only important for airport safety and agricultural use, but also provide for

the streaked horned lark." *Id*.  While acknowledging that "some agricultural activities may harm

or kill streaked horned larks," the Service did not explain how exempting all "routine agricultural

activities" irrespective of their impact on larks would somehow provide for the "long-term

conservation needs of the streaked horned lark" given the Service's finding in the same proposal

that the lark's overall conservation status has dramatically declined while these very same

"routine" activities have been in place.  Nor did the Service explain why it was not at least

proposing that modest limitations be placed on the expansive exemptions for agricultural

activities, such as restrictions on mowing and other ground-disturbing activities during the

breeding and nesting season.

### Comments Urging that the Lark Be Listed as Endangered and Critiquing the Proposed 4(d) Rule

42.     Commenters on the proposed rule, including a "peer reviewer" selected by FWS

itself, urged the FWS to list the lark as endangered and, at the very least, to modify any final 4(d)

rule to make it more protective of larks.

43.     With regard to the listing proposal, commenters explained that the central premise

of the FWS's proposal to list as threatened rather than endangered was the purported stability of

larks in the Willamette Valley, but that this premise is contradicted by the best available

scientific information. For example, Bob Altman, the American Bird Conservancy's Pacific

Northwest Conservation Officer and one of the FWS's hand-selected peer reviewers for the

proposed lark listing, explained that there is a "major failure of the Proposed Rule to examine

and include Breeding Bird Survey (BBS) data" compiled by the United States Geological Survey, and that when such data are considered along with other evidence of population declines and threats in the Willamette Valley, they reflect "declining trends in the Willamette Valley that are substantial (i.e., >5%/year) and significant over the last 40+years." Mr. Altman concluded that the "absence of an examination and summary of the BBS data in the Proposed Rule is highly relevant because the main factor used in the designation of Threatened rather than Endangered status was the perceived stability of lark populations in the Willamette Valley," and that the "combination of precipitous declines reported in the South Puget Sound and Washington Coast/Columbia River [] with significant declines in the Willamette Valley as indicated by the BBS data presented . . . strongly brings into doubt the rationale for considering the lark as Threatened rather than Endangered."

44.    Other commenters explained that even aside from the BBS data reflecting declines in the Willamette Valley, the FWS's acknowledgement in the proposed rule of the extremely dire status of the lark in two of three remaining regions where it still exists along with the tiny and hence inherently precarious size of the population in the Willamette Valley clearly supports an endangered listing. For example, the Audubon Society of Portland urged that a "population that has already been extirpated from more than half its range, whose populations continue to contract from both the north and south, which is declining precipitously in two out of three remaining occupied regions, and whose population status in the third region [is] uncertain and highly vulnerable to both foreseeable habitat loss and modification in the near future as well as stochastic events, is in our professional opinion a species that is moving quickly toward extinction and which merits the full protection of the Endangered Species Act with a designation as 'endangered.'"

45.    With respect to the 4(d) rule proposed by the FWS, commenters explained that the proposed exemption for take was so broad and uncircumscribed that, if adopted, it would pave the way for the lark's ongoing deterioration rather than its conservation.  Peer reviewer Altman explained that the proposed exemptions from the take prohibition "provides blanket coverage of normal operations and maintenance at airports and on agricultural lands" and that "with approximately 80% of the population (airports and agricultural lands) receiving automatic exemptions from take under the 4d Rule, there are few options to advance conservation through formal agreements with landowners after the bird is listed."  Mr. Altman further explained that providing landowners with sweeping exemptions from any take liability without any "conditions of reciprocity for required conservation actions to warrant the exemptions from take"—e.g., commitments to restrict mowing and other especially harmful activities during the lark's breeding and nesting season—"is not a sound approach to conservation" and that this is "especially the case on agricultural lands where highly variable economic factors drive land management changes, which leaves lark conservation as an unknown amid these changes without agreements in place."

46.    In view of the comments received, FWS employees considered making the 4(d) rule more protective of larks by at least taking into consideration the need to protect the species from certain harmful activities during the nesting season. The FWS ultimately rejected that option based on the Service's perception that the agricultural industry would prefer a sweeping 4(d) rule that imposed no restrictions at all on farming operations

47.    In an August 27, 2012 e-mail, FWS biologist Cat Brown advised other FWS employees that a draft of a final 4(d) rule would have provided that "routine ag activities were okay '*when timed to minimize impacts to streaked horned larks during the nesting season*'"

(emphasis added) but that this protective language was "deleted" because "[a]s we discussed at our meeting today, this restriction on timing will make the 4(d) rule much less useful or palatable to the ag community in the Willamette Valley."

### The FWS's Final Decision to List the Lark as Threatened and Issue an Even Less Protective 4(d) Rule than the Service Had Proposed

48.     On October 3, 2013, the FWS published in the Federal Register a final regulation listing the streaked horned lark as a threatened species.  At the same time, the Service published a 4(d) rule that not only failed to adopt the timing restrictions urged by commenters, but that was even more sweeping than the proposed rule in authorizing harmful activities that may proceed without any regard to their adverse impact on the lark.

49.     In its final listing decision, the FWS reaffirmed the finding in its proposed rule that "streaked horned larks in Washington are declining by 40 percent per year" and that the "south Puget Sound population could become extirpated in the near future," 78 Fed. Reg. at 61,489.  With respect to the Willamette Valley, the FWS did not reaffirm the finding in its proposed rule that the population in this area is stable—which was the basis on which the Service proposed to list the lark as threatened rather than endangered.  Rather, in light of the BBS and other data brought to the agency' attention following publication of its proposal, the FWS "agree[d] that the streaked horned lark" in the Willamette Valley "has declined and may be continuing to decline," and that "some of the observed declines [in] lark detection in the BBS data are attributable" to a near-total ban on "field burning" imposed by the Oregon legislature – a ban that is harmful to lark survival because it "render[s] [prairie] habitat unusable for . . . streaked horned larks" by facilitating the "invasion by nonnative grasses and woody vegetation . . . ." 78 Fed. Reg. at 61,463, 61,475.

50.     As in its proposed rule, the FWS's final listing rule delineates a host of threats to the lark's survival throughout its range, including that the "current and ongoing threats to streaked horned lark habitat are resulting in a significant impact to the subspecies and its habitat and will continue into the future," 78 Fed. Reg. at 61,481; that "existing regulatory mechanisms are inadequate to reduce the threats to the . . . lark now or in the future," *id*. at 61,488; that "there are likely to be significant, ongoing threats to the subspecies due to predation, which is the most frequently documented source of mortality for eggs and young," *id*. at 61,496; that "[g]enetic analysis has shown that streaked horned larks have suffered a loss of genetic diversity due to a population bottleneck[], the effect of which may be exacerbated by continued small population size," *id*. at 61,489; and that the "small, isolated nature of the remaining population[] of the . . . streaked horned lark increases the subspecies' vulnerability to stochastic (random) natural events." *Id*. at 61,491.  The Service's final rule explained that, especially during the winter months when the "fewer than 1,600 streaked horned larks rangewide . . . concentrate mainly on the lower Columbia River and in the Willamette Valley," the entire subspecies is subject to "potentially disastrous stochastic events, such as ice storms or flooding, that could kill individuals or destroy limited habitat; a severe weather event could wipe out a substantial percentage of the entire subspecies." *Id.* at 61,492.

51.     Despite finding that the lark is rapidly declining towards extinction in Washington; that the available data also reflect a declining population in the Willamette Valley; that "[s]treaked horned larks face a combination of several high-magnitude threats" which are "immediate, occur throughout the species' range, and are not restricted to any particular significant portion of the range," *id.* at 61,496; and that the "small and declining population of streaked horned larks is certainly at risk of random environmental events that could have

catastrophic consequences" for the entire subspecies at any time, *id.* at 61,492, the FWS again concluded that the lark should be listed as threatened rather than endangered. To support that conclusion, the Service asserted that "[w]e do not have information to suggest that the present threats are of such great magnitude that [the] streaked horned lark is in immediate danger of extinction," *id.* at 61,496, but the Service did not explain how that assertion could be reconciled with the extremely precarious status of the tiny population of birds depicted in the final rule and, in particular, with the Service's finding that a stochastic event could decimate the species at any time.

52.     While acknowledging that the streaked horned lark in Washington is "declining by 40 percent per year" and citing studies concluding that "these populations have reached a point where they are declining towards extinction," the FWS nonetheless found that the lark is not even endangered in a "significant portion of its range." 78 Fed. Reg. at 61,498. The Service reached that conclusion by "consider[ing] whether threats may be so concentrated in some portion of [the lark's] range that, if that portion were lost, the entire subspecies would be in danger of extinction." *Id.* "In applying this test," the FWS "determined that even with the potential loss of the Washington populations, the relatively larger[] population in the Willamette Valley of Oregon would likely persist"; therefore, the subspecies is presently not in danger of extinction, and therefore does not meet the definition of an endangered species under the Act." *Id.* The Service did not reconcile its assertion that the population in the Willamette Valley "would likely persist" with its acknowledgement of evidence that the population is declining, or with the agency's recognition that small concentrated populations are at enormous ongoing risk from stochastic events. Nor did the Service explain why a species must be at risk of extinction everywhere in its range in order to be considered endangered in a "portion" of its range, or why

such a test for endangered status does not effectively read the "significant portion of its range" language out of the ESA.

53.     In its final 4(d) rule, the FWS provided that "[i]ncidental take of streaked horned larks will not be a violation of section 9 of the Act, if the incidental take results from accepted agricultural (farming) practices implemented on farms consistent with State laws on non-Federal lands." 78 Fed. Reg. at 61,503.  This sweeping exemption for all "accepted" agricultural practices "applies only to the Willamette Valley in Oregon because there is no record of the streaked horned lark utilizing agricultural lands in Washington State, despite thorough surveys by" the Washington Department of Fish and Wildlife—i.e., the broad 4(d) exemption applies everywhere larks actually use any agricultural lands. *Id.* at 61,473.  Under the rule, "[a]ccepted agricultural (farming) practices include, but are not limited to" all "[p]lanting, harvesting, rotation, mowing, tilling, discing, burning, and herbicide application of crops"; "transportation activities"; "[l]ivestock grazing according to normally acceptable and established levels"; and "[m]aintenance of irrigation and drainage systems." 78 Fed. Reg. at 61,503.

54.     Although, in issuing its listing and 4(d) rules, the FWS recognized that activities such as burning and mowing of lark habitat may be beneficial and not harmful to the species only when "timing restrictions are observed," 78 Fed. Reg. at 61,474—because engaging in such activities during the active breeding and nesting season destroys nests, kills young birds, displaces adults, and "pose[s] a threat to the subspecies," *id.* at 61,478—the Service's final 4(d) does not require that any such restrictions be followed in order for farming practices to be exempted from the section 9 prohibition on take.  As a result, throughout the Willamette Valley, and notwithstanding the FWS's listing of the lark as a threatened species including, specifically, because of unrestricted agricultural practices in occupied lark habitat, the 4(d) rule means that

agricultural activities may crush, burn, and otherwise destroy active nests and chicks and kill, injure, and displace breeding adults without incorporating any measures or precautions at all to avoid, minimize, or mitigate impacts on the subspecies.

55.     The FWS "acknowledge[d] that the activities covered by in the 4(d) rule are broad" but stated that it "believe[s] that such a special rule will promote the conservation efforts and private lands partnerships critical for species recovery." 78 Fed. Reg. at 61,464. The Service did not explain how a wholesale exemption from section 9 liability in the absence of any conditions designed to limit burning, mowing, and similar activities in the breeding and nesting season would promote conservation efforts on agricultural lands. In addition, while stating that the special rule was intended to "discourag[e] conversions of the agricultural landscape into crops or other lands unsuitable for the streaked horned lark," *id*. at 61,464, the FWS provided no evidence demonstrating that the adoption of restrictions on burning, mowing, and similar activities in the breeding and nesting season would result in landowners converting occupied lark habitat to "lands unsuitable" for the lark—conversions that would themselves violate the ESA's take prohibition in the absence of FWS authorization for such activities.

56.     In addition to broadly exempting agricultural activities from the take prohibition, the section 4(d) rule also exempts activities and impacts at airports, including activities designed to deter birds and other wildlife from using the airport as habitat, as well as incidental take caused by accidental aircraft strikes at airports on non-federal land. 78 Fed. Reg. at 61,503.

## CLAIMS FOR RELIEF

## CLAIM ONE

### Violations of the ESA and APA in Failing to List the Streaked Horned Lark As an Endangered Species

57.     Defendants' refusal to list the streaked horned lark as an endangered species based on the lark's status in all or a significant portion of its range is unlawful because it

contravenes the ESA's statutory definition of an endangered species and renders the phrase

"significant portion of its range" in that definition meaningless; disregards the best available

scientific data regarding the status of, and imminent threats to, the lark; fails rationally to apply

the five statutory listing factors to the available data; contradicts the FWS's own recognition that

the lark in fact faces an imminent risk of extinction throughout all or at least a significant portion

of its range; and was improperly motivated by Defendants' desire to issue a section 4(d) rule

broadly exempting activities impacting the lark from the section 9 take prohibition.

Accordingly, Defendants' listing of the lark as threatened rather than endangered violates the

ESA and is arbitrary, capricious, an abuse of discretion and not in accordance with law in

violation of the APA, 5 U.S.C. § 706(2).

## CLAIM TWO

## Violations of the ESA and APA in Issuing the Section 4(d) Rule

58.     The final 4(d) rule for streaked horned larks is unlawful because the rule, and

especially the sweeping exemption for agricultural activities in the Willamette Valley, is not

"necessary and advisable for conservation" of the lark.  16 U.S.C. § 1533(d).  The best available

data as set forth by the FWS itself reflects that authorizing activities such as mowing, burning,

and similar activities without providing for any restrictions during the nesting and breeding

season will not only fail to conserve larks but will have the opposite effect on species survival

and recovery.  By unconditionally exempting from the ESA's take prohibition the very activities

that have contributed to the lark's imperiled status, including in the Willamette Valley, the FWS

irrationally eliminated any incentive for agricultural and other interests to take the needs of the

lark into consideration in their routine activities, particularly during the breeding and nesting

season, and the Service did so in the absence of any evidence that such a broad exemption is

necessary to accomplish any legitimate objective.  Accordingly, the 4(d) rule violates the ESA

and is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of

the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

(1)     Declare that Defendants' October 3, 2013, decision to list the streaked horned lark as

threatened rather than endangered violates the ESA and APA;

(2)     Remand the listing decision for further consideration;

(3)     Declare that Defendants' October 3, 2013 4(d) rule for the streaked horned lark is

contrary to the ESA and APA;

(4)     Vacate and remand the 4(d) rule for further consideration;

(5)     Award Plaintiffs their attorneys' fees and costs; and

(6)     Grant Plaintiffs such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Eric R. Glitzenstein

Eric R. Glitzenstein
(Pro Hac Vice Application pending)
4115 Wisconsin Ave., N.W.
Washington, D.C.  20016
(202) 588-5206
eglitzenstein@meyerglitz.com

/s/ Nick Lawton
Nick Lawton
Oregon Bar No. 143685
4115 Wisconsin Ave., N.W.
Washington, D.C.  20016
nlawton@meyerglitz.com

Attorneys for Plaintiffs