Eric R. Glitzenstein (D.C. Bar No. 358287) (admitted pro hac vice)
eglitzenstein@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C.  20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Nick Lawton (Oregon Bar No. 143685)
nlawton@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C.  20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Attorneys for Plaintiff

## IN THE UNITED STATES DISRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

_____

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ) | |
| ) | |
| ) | |
| ) | |
| Plaintiff, ) | No. 3:18-cv-00359-MO |
| ) | |
| v. ) | PLAINTIFF'S MOTION FOR |
| ) | SUMMARY JUDGMENT |
| RYAN ZINKE, Secretary, U.S. Department of the ) | AND REQUEST FOR ORAL |
| Interior, *et al.*, ) | ARGUMENT |
| ) | |
| Defendants. ) | |
| ) | |

_____

Plaintiff Center for Biological Diversity ("Center") hereby moves for summary judgment

on the grounds that there are no genuine issues of material fact in this case involving review on an

Administrative Record, and the Center is entitled to judgment as a matter of law that Federal

Defendants violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the

Administrative Procedure Act, 5 U.S.C. § 706, in connection with Defendants' decisions regarding

the streaked horned lark. In support of this motion, Plaintiff relies on the accompanying

memorandum, Exhibits A-B, and a Proposed Order. Pursuant to LR 7-1, the parties have conferred

Plaintiff's Motion for Summary Judgment

regarding this motion and agree that they are unable to resolve this dispute involving the validity of federal agency action, and hence that resolution of the parties' cross-motions for summary judgment will be necessary.

Plaintiff respectfully requests oral argument on this motion.

Dated: October 10, 2018

Respectfully submitted,

/s/Eric R. Glitzenstein

Eric R. Glitzenstein
Admitted Pro Hac Vice
eglitzenstein@meyergliz.com

/s/Nick Lawton

Nick Lawton
Oregon Bar No. 143685
nlawton@meyerglitz.com

Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C.  20016
(202) 588-5206

Counsel for Plaintiff

Plaintiff's Motion for Summary Judgment

Eric R. Glitzenstein (D.C. Bar No. 358287) (admitted pro hac vice)
eglitzenstein@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C.  20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Nick Lawton (Oregon Bar No. 143685)
nlawton@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C.  20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Attorneys for Plaintiff

**IN THE UNITED STATES DISRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

_____

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:18-cv-00359-MO |
| | ) | |
| v. | ) | MEMORANDUM IN |
| | ) | SUPPORT OF PLAINTIFF'S |
| RYAN ZINKE, Secretary, U.S. Department of the | ) | MOTION FOR SUMMARY |
| Interior, *et al.*, | ) | JUDGMENT |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................... ii

INTRODUCTION ................................................................1

BACKGROUND ................................................................2

I.     STATUTORY SCHEME ...............................................2

II.    FACTS .........................................................5

        A.    THE STREAKED HORNED LARK ....................................5

        B.    THE FWS'S PROPOSED LISTING AND 4(d) RULES ................... 9

        C.    PEER REVIEW AND PUBLIC COMMENTS URGING AN
            ENDANGERED LISTING AND CRITIQUING THE 4(d) RULE ...........14

        D.    THE FWS'S FINAL LISTING AS THREATENED AND ADOPTION
            OF A BROADER RULE 4(d) EXEMPTION THAN PROPOSED ...........17

ARGUMENT ..................................................................21

I.     STANDARD OF REVIEW ..........................................21

II.    THE SERVICE'S REFUSAL TO LIST THE LARK AS ENDANGERED
      IS CONTRARY TO THE ESA AND ARBITRARY AND CAPRICIOUS. .........23

        A.    THE FWS'S FINDING THAT THE LARK IS NOT ENDANGERED
            IN "ALL" OF ITS REMAINING RANGE IS ARBITRARY AND
            CAPRICIOUS AND CONTRARY TO THE ESA. ...................... 24

        B.    AT MINIMUM, THE FWS'S CONCLUSION THAT THE LARK IS
            NOT ENDANGERED IN A "SIGNIFICANT PORTION OF ITS
            RANGE" VIOLATES THE ESA AND CIRCUIT PRECEDENT. ...........31

III.    THE 4(d) RULE IS CONTRARY TO THE ESA AND ARBITRARY AND
      CAPRICIOUS. ..................................................36

IV.    THE APPROPRIATE REMEDY ......................................40

## TABLE OF AUTHORITIES

CASES                                                                   PAGE

*Alaska v. Fed. Subsistence Bd.*,
   544 F.3d 1089 (9th Cir. 2008) ...........................................................22

*Ariz. Cattle Growers Ass'n v. Salazar*,
   606 F.3d 1160 (9th Cir. 2010) ...................................................21, 39

*Ariz. Cattle Growers v. U.S. Fish & Wildlife Serv.*,
   273 F.3d 1229 (9th Cir. 2001) ...................................................21, 22

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
   515 U.S. 687 (1995)...........................................................................37

*Burlington Truck Lines Inc. v. United States*,
   371 U.S. 156 (1962)...........................................................................32

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984).................................................22, 33, 34, 35

*Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021 (E.D. Cal. 2010)......................26

*Crickon v. Thomas*,
   579 F.3d 978 (9th Cir. 2009) ...........................................................32

*Ctr. for Biological Diversity v. Jewell*,
   248 F. Supp. 3d 946 (D. Ariz. 2017) ..........................................33, 34

*Ctr. for Biological Diversity v. Jewell*,
   No. CV-15-00019-TUC-JGZ, 2018 WL 1586651 (D. Ariz. Mar.
   31, 2018) ...................................................................................36, 39

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   No. C 16-06040 WHA, 2018 WL 4538622 (N.D. Cal. Sept. 21,
   2018) ................................................................................28, 29, 30

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   No. C04-04324 WHA, 2005 WL 2000928 (N.D. Cal. Aug. 19,
   2005) ...................................................................................26, 39

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ...................................................9, 26

*Defenders of Wildlife v. Babbitt*,
  958 F. Supp. 670 (D.D.C. 1997) .......................................................................26

*Defenders of Wildlife v. Norton*,
  258 F.3d 1136 (9th Cir. 2001) ........................................ 23, 24, 31, 32, 33, 34, 35

*Defenders of Wildlife v. Tuggle*,
  607 F. Supp. 2d 1095 (D. Ariz. 2009) ...........................................................36, 37

*Desert Survivors v. U.S. Dep't of the Interior*,
  321 F. Supp. 3d 1011 (N.D. Cal. 2018) .........................................................26, 35

*Desert Survivors v. U.S. Dep't of the Interior*,
  No. 16-cv-01165-JCS, 2018 WL 4053447 (N.D. Cal. Aug. 24,
  2018) .............................................................................................................35

*Dioxin/Organochlorine Ctr. v. Clarke*,
  57 F.3d 1517 (9th Cir. 1995) .............................................................................22

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*,
  378 F.3d 1059 (9th Cir. 2004), *amended* 387 F.3d 968 .................................4, 37

*Greater Yellowstone Coal., Inc. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011) .....................................................................28, 29

*Humane Soc'y of the U.S. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) .....................................................................25, 40

*Kern Cty. Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) ...........................................................................26

*Cal ex. rel. Lockyer v. United States Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ...............................................................................2

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................21, 22, 30, 32, 40

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
  __ U.S. __, 138 S Ct. 617 (2018).....................................................................32

*Native Fish Soc'y v. Nat'l Marine Fisheries Servs.*,
  992 F. Supp. 2d 1095 (D. Ore. 2014) ...........................................................37, 39

*Natural Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*,
   421 F.3d 872 (9th Cir. 2005) ..............................................................34

*Olympic Forest Coalition v. Coast Seafoods Co.*,
   884 F.3d 901 (9th Cir. 2018) ..............................................................36

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) .............................................................25

*Pollinator Stewardship Council v. U.S. EPA*,
   806 F.3d 520 (9th Cir. 2015) ..............................................................40

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997)..............................................................................36

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ..............................................................26

*Sierra Club v. Clark*,
   755 F.2d 608 (8th Cir. 1985) ..............................................................37

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)......................................................................22, 34

*Sw. Center for Biol. Diversity v. Babbitt*,
   215 F.3d 58 (D.C. Cir. 2000)...............................................................27

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978)........................................................................2, 37

*Tucson Herpetological Soc'y v. Salazaar*,
   566 F.3d 870 (9th Cir. 2009) .........................................................29, 30

*United Food and Commercial Workers Union Local 751 v. Brown
   Group, Inc.*,
   517 U.S. 544 (1996)..............................................................................32

## STATUTES AND REGULATIONS

5 U.S.C. § 706.............................................................................................2

5 U.S.C. § 706(2)(A)................................................................................21

16 U.S.C. §§ 1531-44 ................................................................................1

Plaintiff's Summary Judgment Memorandum

16 U.S.C. § 1531(b) ..................................................................................2

16 U.S.C. § 1532(2) ..................................................................................4

16 U.S.C. § 1532(3) ................................................................................36

16 U.S.C. § 1532(6) ...............................................................1, 2, 12, 13, 23, 31

16 U.S.C. § 1532(19) ...........................................................................1, 3

16 U.S.C. § 1533 ......................................................................................2

16 U.S.C. § 1533(b)(1)(A) ..................................................................3, 26

16 U.S.C. § 1533(d) .......................................................................1, 3, 36

16 U.S.C. § 1536 ..................................................................................4, 5

16 U.S.C. § 1538 ......................................................................................3

16 U.S.C. § 1539 ......................................................................................4

50 C.F.R. § 17.3 ................................................................................3, 40

50 C.F.R. §§ 17.31 ...................................................................................4

50 C.F.R. § 424.11(c) ...............................................................................3

40 Fed. Reg. 44,412 (Sept. 26, 1975) ......................................................4

66 Fed. Reg. 54,808 (Oct. 30, 2001)........................................................9

76 Fed. Reg. 76,987 (Dec. 9, 2011) ....................................32, 33, 34, 35

77 Fed. Reg. 61,938 (Oct. 11, 2012)...................................9, 10, 11, 12

79 Fed. Reg. 37,578 (July 1, 2014)......................................33, 34, 35

83 Fed. Reg. 35,174 (July 25, 2018).......................................................4

**GLOSSARY**

APA – Administrative Procedure Act

AR – Administrative Record

BBS – Breeding Bird Survey

ESA – Endangered Species Act

FWS – United States Fish and Wildlife Service

SPR – Significant Portion of Range

USGS – United States Geological Survey

## INTRODUCTION

This case concerns the imperiled Streaked Horned Lark (the "Lark"). Due to habitat loss and degradation, Larks have declined to a tiny fraction of their historic numbers and are at immediate risk of extinction. According to the Fish and Wildlife Service ("FWS" or "Service"), no more than 1,600 of the birds remain in a handful of scattered populations in Washington and Oregon. The FWS has concluded that most of the remaining populations are rapidly declining towards extinction in the foreseeable future. The only other population—in the Willamette Valley—not only faces myriad threats but is so small that it is at risk of being wiped out by extreme weather events at any time. Nonetheless, the FWS reached the arbitrary and unlawful conclusion that the Lark is not "endangered" within the meaning of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531-44, which defines an endangered species as one that is "in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).

Instead of affording the Lark the protected status to which it is legally entitled, the Service instead assigned the Lark a far less protective "threatened" designation. Worse, the agency issued a "special" rule that authorizes the unfettered continuation of the very activities the Service found to have brought the species to the point where ESA protection is necessary. Although the ESA generally prohibits the killing, harming, or other forms of "take" of species listed as endangered, *see* 16 U.S.C. §§ 1532(19), 1538(a)(1), for species listed as threatened, section 4(d) of the Act authorizes the Service to issue regulations delineating prohibited activities, provided that such regulations must be "necessary" for the "conservation of the species." *Id*. § 1533(d). However, rather than provide for the Lark's conservation, the FWS's rule authorizes—without any restrictions or mitigating conditions—activities that the Service itself found are extremely detrimental to the species'

survival, including the mowing and plowing of active Lark nests on agricultural lands.

Because this is the antithesis of "conservation" of Larks and, in any event, has no factual

basis in the administrative record, the rule should be vacated pursuant to the ESA and the

Administrative Procedure Act, 5 U.S.C. § 706 ("APA").

**BACKGROUND**

## I.    <u>STATUTORY SCHEME</u>

Enacted in 1973, the ESA sets forth a comprehensive scheme for the protection of

endangered and threatened species in the United States. *See Cal ex. rel. Lockyer v. United

States Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). Congress passed the ESA to

"provide a program for the conservation of . . . endangered species and threatened species,"

and to "provide a means whereby the ecosystems upon which endangered species and

threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA is the "most

comprehensive legislation for the preservation of endangered species ever devised by any

nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

The ESA provides for the protection and recovery of species listed as "endangered"

or "threatened." 16 U.S.C. § 1533. An endangered species is "any species which is danger

of extinction throughout all or a significant portion of its range," and a threatened species is

"any species which is likely to become an endangered species within the foreseeable future

throughout all or a significant portion of its range." *Id*. §§ 1532(6), (20). The FWS, which

has been delegated authority to implement the ESA by the Secretary of the Interior, must

list a species as endangered or threatened based on the presence of any one of five factors,

including the "present or threatened destruction, modification, or curtailment of its habitat

or range"; the "inadequacy of existing regulatory mechanisms"; or any "other natural or

manmade factors affecting its continued existence." *Id*. §§ 1533(a)(1)(A), (D), (E). For

Plaintiff's Summary Judgment Memorandum

purposes of the Act's protections, "the term 'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16). In determining whether any such "species" are endangered or threatened, the Service must use the "best scientific and commercial data available . . . ." *Id*. § 1533(b)(1)(A); 50 C.F.R. § 424.11(c).

The listing of a species as "endangered" triggers prohibitions under Section 9 of the ESA, 16 U.S.C. § 1538, that apply to any "person," as broadly defined by the Act. *Id*. § 1532(13). In the absence of authorization by the FWS, section 9 makes it unlawful for any person to "take" any member of an endangered species. *Id*. § 1538(a)(1)(B). "Take" is defined to include "harass," "harm," "wound," or "kill." *Id*. § 1532(19). "Harm" is further defined by regulation to "include significant habitat modification or degradation where it actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *see also id*. (defining "harass" to mean an "act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering").

The ESA's take prohibitions do not automatically apply to species listed as threatened. Rather, section 4(d) provides that whenever any species is listed as threatened, "the [FWS] shall issue such regulations as [it] deems necessary and advisable to *provide for the conservation of such species*," including by "prohibit[ing] with respect to any threatened species any act prohibited" for endangered species. 16 U.S.C. § 1533(d) (emphasis added). The ESA defines "conservation" to mean "the use of all methods and procedures *which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer*

Plaintiff's Summary Judgment Memorandum

*necessary*," 16 U.S.C. § 1532(2) (emphasis added), i.e., the species has *recovered* to the point where it may be delisted. *See also Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended* 387 F.3d 968 ("The ESA's definition of 'conservation' speaks to the recovery" of a listed species.") (quotation omitted).

Shortly after the ESA's enactment, the Service exercised its authority under section 4(d) by extending the prohibition on "take" in section 9 to all threatened species for which the Service does not adopt a "special rule" applicable to a particular species. *See* 50 C.F.R. §§ 17.31(a), 17.31(c); 40 Fed. Reg. 44,412, 44,414 (Sept. 26, 1975). Thus, unless the FWS adopts such a tailored 4(d) rule, a threatened species receives the same broad prohibition on unauthorized take as an endangered species.[1]

Whether a species is listed as endangered or threatened, the ESA provides that the FWS may, under specified circumstances, authorize take that would otherwise be prohibited. Section 10 provides that for any take that is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," the Service may permit the take when certain criteria are satisfied, including that the applicant prepare a "conservation plan" specifying "what steps the applicant will take to minimize and mitigate" the activity's impacts. 16 U.S.C. §§ 1539(a)(1)(B), (a)(2)(A). Similarly, section 7 establishes a process whereby take of listed species may be authorized by the FWS when a federal agency undertakes, funds, or authorizes an action affecting listed species. *Id.* § 1536. The agency

---

[1] While recognizing that this longstanding approach to section 4(d) represents a "reasonable approach" to implementation of the ESA, the FWS recently proposed to eliminate the general prohibition on the take of threatened species for which the Service has not issued a species-specific 4(d) regulation. 83 Fed. Reg. 35,174, 35,175, 35,177 (July 25, 2018). However, even if this proposal is adopted as a final rule it will not apply to any species listed "on or prior" to the day the new rule is published. *Id.*

Plaintiff's Summary Judgment Memorandum

4

must "consult" with the FWS, and for actions that the FWS determines will cause take but not jeopardize the species' existence, the Service must specify "reasonable and prudent measures" to "minimize" adverse impacts. *Id*. § 1536(b)(4).

## II.    FACTS

### A.    <u>THE STREAKED HORNED LARK</u>

The streaked horned lark is a subspecies of horned lark that is endemic to the Pacific Northwest west of the Cascades, i.e., it exists nowhere else on Earth. *See* Administrative Record ("AR") at SHL-00590. Horned larks are small, ground-dwelling birds. Adults "have a black bib, black whisker marks, black 'horns' (feather tufts that can be raised or lowered), and black tail feathers with white margins." *Id*. The streaked horned lark is distinguished by its "dark brown back, yellowish underparts, a walnut brown nape, and a yellow eyebrow stripe and throat." *Id.*



Larks form pairs in the spring and "create nests in shallow depressions in the ground and line them with soft vegetation." AR-594. During the mating period, the males "sing a tinkling little song that may be likened to a whispered song of the meadowlark." AR-20892. Female Larks "construct the nest without help from the male," and Larks "return each year to the place they were born." AR-594. The nesting season begins in mid-April and ends in late August. *Id*. Clutches range from one to five eggs. *Id*. The "funny spotted youngsters begin to be [] conspicuous" in May and June, AR-20892; they "leave

Plaintiff's Summary Judgment Memorandum

5

the nest by the end of the first week after hatching, and are cared for by the parents until

they are about 4 weeks old, when they become independent." AR-594.



AR 21210 (newly hatched Larks).

The Lark has suffered a dramatic decline in its range. Its "breeding range

historically extended from southern British Columbia, Canada, south through the Puget

lowlands and outer coast of Washington, along the lower Columbia River, through the

Willamette Valley, the Oregon Coast and into the Umpqua and Rogue River Valleys of

southwestern Oregon." AR-591. However, the Lark "has been extirpated as a breeding

subspecies throughout much of its range, including all of its former range in British

Columbia, the San Juan Islands, the northern Puget Trough, the Washington coast north of

Grays Harbor, the Oregon coast, and the Rogue and Umpqua Valleys in southwestern

Oregon . . . ." *Id*. Due to extensive habitat loss and degradation in the Lark's natural prairie

habitat, *see* AR-15808 (City of Portland comments explaining that native prairies in the

region have declined by 98-99%), the Lark has been relegated to a few remnant breeding

populations, as illustrated in the following comparison of historic and current range:

Plaintiff's Summary Judgment Memorandum



*Approximate historical distribution (a.) and current distribution (b.) of* E. a. strigata *(adapted from Gabrielson and Jewett 1940; Behle 1942; Rogers 2000; Altman 2003; Stinson 2005).*

AR-22402. As the FWS has explained, while the "pattern of range contractions for other Pacific Northwest species [] shows a loss of populations in the northern part of the range, with healthier populations persisting in the southern part,"  the Lark "is an exception to this pattern—its range has contracted from both the north and the south simultaneously." AR-593. With such a vastly reduced range that "may still be contracting," *id*., the Lark's population has plummeted to a "current rangewide population of . . . about 1,170-1,610 individuals" remaining. AR-592.

Larks in Washington occur on the South Puget Sound, the Washington coast, and islands and dredge disposal sites in the lower Columbia River. The FWS has found that the "total estimated population of streaked horned larks in these areas is 270-310 birds"; that Larks in the Washington portions of the range are "declining by 40 percent per year"; and

Plaintiff's Summary Judgment Memorandum

the best available data project that Larks in Washington "would likely become extirpated within 25 years," if not sooner. AR-632.[2] The Willamette Valley in Oregon provides the Lark's only other occupied habitat. Fewer than 1,000 Larks may remain in the Valley, where Larks "face many of the same threats as populations in Washington . . . ." *Id*.

As the Lark's natural habitat has dwindled, the remaining birds have been compelled to rely on areas that have been drastically altered by people but in a manner that replicates some features of the bird's original habitat. AR-593. Natural habitat "used by larks is generally flat with substantial areas of bare ground and sparse low-stature vegetation primarily comprised of grasses" and similar vegetation. *Id*. In the absence of such natural habitat, Larks have become dependent on "bare ground in agricultural fields and wetland mudflats; habitats subject to frequent human disturbance includ[ing] mowed fields at airports, managed road margins, agricultural crop fields, and disposal sites for dredge material." AR-594. Although Larks now depend on such areas for their survival, "populations are vulnerable because the habitats used are often ephemeral or subject to frequent human disturbance." *Id*. As the FWS has explained, Larks face a stark dilemma: "without large-scale, manmade disturbance (e.g., burning, mowing, cropping, and deposition of dredge spoils), available habitat would decrease rapidly, but these same activities can threaten individuals when they are at sensitive life-history stages." *Id*.

_____

[2] The following table from a study cited by the FWS (AR-22417) reflects the indisputably dire situation in Washington:

| Stochastic growth rate | | Time of first extinction (yrs.) | Median time to extinction (yrs.)* | Extinction prob. at 25 yrs. |
|---|---|---|---|---|
| Statewide | 0.58 | 13 | 17 (13-22) | **100** |
| Puget Lowlands | 0.51 | 7 | 9 (7-12) | **100** |
| Coastal | 0.83 | 13 | 17 (13-22) | **100** |
| Columbia River | 0.39 | 3 | 4 (3-7) | **100** |

Plaintiff's Summary Judgment Memorandum

8

The Service first considered the Lark as a candidate for ESA listing in 2001. AR-587 (citing 66 Fed. Reg. 54,808 (Oct. 30, 2001)). In 2002, the Plaintiff Center for Biological Diversity ("Center") submitted a formal listing petition. AR-17808. Among other threats, the Center stressed that "[i]n the Willamette Valley it is estimated that more than 99% of the native grassland has been lost" to agriculture and other human impacts, and that in order for the Lark to persist on the agricultural lands that have displaced the birds' natural habitat, it is essential that efforts be made to lessen adverse effects during the active breeding season. AR-17818-19.

In 2006, the FWS determined that the Lark faced "imminent threats of a high magnitude" in view of the "continued loss of suitable lark habitat, risks to the wintering populations, and plans for development" and other activities that are "imminent threats to the species." AR-587; *see also* AR-6147. Although the FWS assigned the Lark the highest possible "listing priority," *id.*; *see also* AR-6088 (2009 FWS e-mail stating that the Lark is "critically imperiled rangewide"), the agency took no action until it was sued by the Center for failing to make ESA listing decisions regarding the Lark and other species in a timely manner. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1061-62 (9th Cir. 2018) (describing the Center's and FWS's settlement regarding the "backlog of ESA listing decisions").

**B.      THE FWS'S PROPOSED LISTING AND 4(d) RULES**

In October 2012, the FWS proposed listing the Lark under the ESA.  *See* 77 Fed. Reg. 61,938 (Oct. 11, 2012); AR-463.[3] The Service explained that although the Lark had been a "common summer resident" and "abundant" in a range extending from British

---

[3] The same Federal Register Notice proposed listing the Taylor's checkerspot butterfly, another Pacific Northwest species dependent on prairie habitats, as endangered.

Plaintiff's Summary Judgment Memorandum

9

Columbia to southern Oregon, it has been extirpated as a breeding subspecies throughout

much of its range . . . ." AR-473. The Service's proposal divided the "current range" of the

Lark into three remnant regions: "(1) [t]he south Puget Sound in Washington; (2) the

Washington coast and lower Columbia River islands (including dredge spoil deposition

sites near the Columbia River in Portland, Oregon); and (3) the Willamette Valley in

Oregon." *Id.* The proposal described the Lark's status in the first two regions (which the

FWS frequently refers to as the "Washington" portion of the species' range) in especially

dire terms, explaining that "populations at these sites appear to be declining by 40 percent

per year," AR-474, and "have reached a point where they are declining towards extinction

. . . ." AR-496; *see also* AR-28301 (study relied on by FWS finding that these populations

are "declining rapidly and have reached a point where local sites are not sustainable").[4]

The listing proposal stated that "[w]e do not have population trend data in Oregon

that is comparable to the study in Washington," but that there are only "about 900 – 1,300

breeding streaked horned larks in the Willamette Valley," with the largest known

population breeding at the Corvallis Municipal Airport, where mowing and other activities

designed to facilitate airport operations also create usable Lark habitat but place the birds at

risk of collisions with aircraft. AR-474.

The FWS's proposed rule explained that there are "many other ongoing threats to

the streaked horned lark's habitat *throughout its range*, including: (1) [c]onversion to

agriculture and industry; (2) loss of natural disturbance processes such as fire and flooding;

---

[4] In working on a draft of the proposed rule, FWS biologist Cat Brown put it more
bluntly: "We have determined that the status in Washington is clearly awful" and that the
Lark in "Washington is going to hell in a handbasket." AR-8558, 8559; *see also* AR-7197
(population modeling analysis stating that "'[c]learly, the subpopulations of [Larks] in
Washington are in grave danger").

Plaintiff's Summary Judgment Memorandum

(3) encroachment of woody vegetation; (4) invasion of coastal areas by nonnative beachgrasses; and (5) incompatible management practices." AR-481 (emphasis added). With regard to the Willamette Valley, the Service stated that "native grassland has been reduced from the most common vegetation type to scattered parcels intermingled with rural residential development and farmland; it is estimated that less than one percent of the native grassland and savanna remains in Oregon." AR-475. The Service explained that Larks have relied on "agricultural land in the Willamette Valley [that] is devoted to grass seed production fields," which approximates (albeit poorly) the Lark's native prairie habitat. AR-480. However, a "decreased demand for grass seed has resulted in farmers switching to other agricultural commodities" that are incompatible with Lark persistence, and the "continued decline of the grass seed industry . . . will result in fewer acres of suitable breeding and wintering habitat for streaked horned larks." *Id.*

The FWS further stated that listing is warranted because "existing regulatory mechanisms are not adequate to reduce the threats . . . [to the] streaked horned lark now or in the future." AR-488. The Service explained that "few of the [Lark's] breeding or wintering habitats are managed for the conservation of the species," including in the Willamette Valley. AR-495. The proposed rule specifically found that "Oregon State regulatory mechanisms . . . are inadequate to protect the . . . the streaked horned lark from further population declines associated with habitat loss or inappropriate management." AR-488; *see also id.* ("Lack of essential habitat protection under State laws leaves these species at continued risk of habitat loss and degradation in Washington and Oregon.").

The FWS also explained that the "small, isolated nature of the remaining populations of . . . [Larks] increases the species' vulnerability to stochastic (random) natural events" and that "[w]hen species are limited to small, isolated habitats, they are

Plaintiff's Summary Judgment Memorandum

more likely to become extinct due to a local event that negatively affects the population." AR-491. Of particular concern, "in the winter [Larks] concentrate mainly on the lower Columbia River sites and in the Willamette Valley," and "[s]uch concentration exposes the wintering populations to potentially disastrous stochastic events such as ice storms or flooding that could kill individuals or destroy limited habitat; a severe weather event could wipe out a substantial percentage of the entire subspecies." AR-492. Compounding this grave risk, "[g]enetic analysis has shown that [Larks] have suffered a loss of genetic diversity due to a bottleneck in population size []," which is "linked to increased chances of inbreeding depression, reduced disease resistance, and reduced adaptability to environmental change, leading to reduced reproductive success." AR-488-89.

Despite painting this bleak picture of the Lark's current status and myriad threats to its continued existence, the FWS proposed to list the Lark as threatened rather than endangered. According to the proposal, a threatened listing was justified because, while the Lark is rapidly heading towards extinction everywhere but the Willamette Valley, *see* AR-496 (explaining that, according to the best available science, the Lark populations on the south Puget Sound, the Washington coast, and sites in the lower Columbia River, "would likely become extinct within 25 years"), the "population of Larks in the Willamette Valley appears to be more stable" and "[a]lthough [Larks] in the Willamette Valley face many of the same threats as populations in Washington, we have no information to indicate that populations in the Willamette Valley are experiencing declines . . . ." *Id.*

In addressing whether the anticipated loss of the entire Washington portion of the range means that the Lark must at the very least be considered "in danger of extinction throughout . . . a *significant portion of its range*," 16 U.S.C. § 1532(6) (emphasis added)— thus warranting an endangered listing on that basis—the FWS stated that it considered

12

Plaintiff's Summary Judgment Memorandum

whether "if that [Washington] portion were lost, *the entire subspecies would be in danger of extinction.*" AR-496-97 (emphasis added). In applying that test, the FWS "determined that even with the potential loss of the Washington populations, the relatively larger, more stable population in the Willamette Valley of Oregon would likely persist, therefore the *subspecies as a whole* is not presently in danger of extinction." AR-497 (emphasis added). The FWS did not explain how its finding that the Willamette Valley portion of the range "would likely persist" regardless of what happens to the Lark elsewhere could be reconciled with the fact that Larks in the Valley "face many of the same threats as populations" in Washington, AR-496, as well as "potentially disastrous stochastic events such as ice storms or flooding . . . that could have catastrophic consequences." AR-492.

Rather than apply the "standard protections for threatened species," the FWS proposed a "special" 4(d) rule the Service said was "necessary and advisable to provide for the conservation of the species." AR-498. The proposed rule provided that *any* "take of the [Lark] caused by restoration and maintenance activities either through agricultural operations or by airports on State, county, private or tribal lands would be exempt from section 9 of the Act." *Id*. The Service also "propose[d] to exempt" from the take prohibition "normal farming or ranching activities" in the Willamette Valley (the only location where Larks occupy agricultural lands), "including: grazing; routine fence and structure maintenance, mowing, herbicide use, burning, and other routine activities" described in the proposed rule, regardless of their adverse impacts on Larks. *Id*. at 498-99.

The FWS stated that this expansive authorization to kill or otherwise take Larks—including, e.g., through mowing or plowing over nests occupied by eggs or young birds unable to escape, even if the nests could be easily avoided—would somehow "further conservation of the species by discouraging conversion of the agricultural landscapes into

13

Plaintiff's Summary Judgment Memorandum

habitats unsuitable for" the Lark. AR-499. The proposal presented no evidence that such

"conversion" would likely occur if modest conditions were adopted to protect the few

remaining Larks during the vital breeding season. Nor did the proposal explain how merely

maintaining the status quo, including agricultural activities that "may harm or kill streaked

horned larks," could "promote the conservation" (i.e., recovery) of the Lark given the

Service's findings that that the "subspecies is threatened in the Willamette Valley," AR-

496, and that existing "regulatory mechanisms" in Oregon "do not protect the . . . [Lark]

from further population declines associated with habitat loss or inappropriate

management." AR-486.[5]

### C.    PEER REVIEW AND PUBLIC COMMENTS URGING AN ENDANGERED LISTING AND CRITIQUING THE 4(d) RULE

Commenters on the proposed rule, including a leading expert on the Lark whose

"peer review" was solicited by the FWS itself, *see, e.g.* AR-14970, 14984 (explaining that

pursuant to the FWS's formal peer review policy, the Service solicited reviews from

"recognized experts" and "specialists in the relevant area of expertise"), urged the FWS to

list the Lark as endangered, and at the very least to modify any final 4(d) rule concerning

agricultural lands to make it more protective of Larks. The FWS's hand-selected peer

reviewer Robert Altman, who has studied the Lark for decades in the Willamette Valley

and elsewhere, and whose research was extensively cited in the proposed and final rules,

explained that there is a "major failure of the Proposed Rule to examine and include

Breeding Bird Survey (BBS) data" compiled by the United States Geological Survey

_____

[5] The FWS considered a draft of the proposed 4(d) rule that would have exempted agricultural activities "*when timed appropriately to minimize impacts* to [Larks] during the nesting season," AR-11695 (emphasis added), but this qualifying language was "specifically deleted" because any "restriction on timing will make the 4(d) rule much less useful or palatable to the ag community in the Willamette Valley." AR-11870.

Plaintiff's Summary Judgment Memorandum

("USGS"), and that when such data are considered along with other evidence of population declines and threats in the Willamette Valley, they reflect "declining trends in the Willamette Valley that are substantial (i.e., >5%/year) and significant over the last 40+years." AR-15073-74. The peer review presented a detailed analysis of the BBS data demonstrating significant declines in the Valley. AR-15074-76.[6] The review concluded that the "absence of an examination and summary of the BBS data in the Proposed Rule is highly relevant because the main factor used in the designation of Threatened rather than Endangered status was the perceived stability of lark populations in the Willamette Valley," and that the "combination of precipitous declines reported in the South Puget Sound and Washington Coast/Columbia River [] with significant declines in the Willamette Valley as indicated by the BBS data presented . . . strongly brings into doubt the rationale for considering the lark as Threatened rather than Endangered." AR-15076.[7]

---

[6] *See, e.g.*, the following Table in the peer review reflecting declining Lark observations in one of the "routes" in the Valley where Larks have been observed:

| Years | Number of detections |
|---|---|
| 1972-1976 | 17, 14, 19, 25, 22 |
| 1988-1992 | 12, 17, 6, 8, 10 |
| 2006-2010 | 0, 4, 3, 0, 0 |

AR-15075; *see also* AR-15279 (comments of the American Bird Conservancy explaining that the BBS data reflect "substantial drops in numbers" in several routes used by Larks and that "[t]his information should have been presented in the proposed rule and considered as counter to the assertion of stability of lark populations" in the Valley).
    [7] The FWS obtained two other "peer reviews," but the Altman review was by far the most detailed and the only one to address the BBS data omitted from the proposed rule. *See* AR-15035, 15042. Neither of the other peer reviewers specifically discussed whether the Lark warranted listing as endangered, although one of them (from Canadian biologist Alaine Camfield), stated that the Service's listing should take into account that "extreme weather events are likely to increase in frequency and severity as climate changes" and that Larks "may be less able to adapt to nest loss due to extreme weather than some other species given that they appear to have long re-nesting intervals after nest loss." AR-15043.

Plaintiff's Summary Judgment Memorandum

Leading bird conservation organizations commented that, even putting aside the BBS data reflecting declines in the Willamette Valley, the proposed rule's acknowledgement of the extremely dire status of the Lark throughout most of its range, along with the tiny and hence inherently precarious size of the population in the Valley, strongly supports an endangered listing. The Audubon Society of Portland explained that:

> a population that has already been extirpated from more than half its range, whose populations continue to contract from both the north and south, *which is declining precipitously in two out of three remaining occupied regions*, and whose population status in the third region [is] uncertain and highly vulnerable to both foreseeable habitat loss and modification in the near future as well as stochastic events, *is in our professional opinion a species that is moving quickly toward extinction and which merits the full protection of the Endangered Species Act with a designation as 'endangered.'*

AR-15601 (emphasis added).[8]

With respect to the proposed section 4(d) rule, commenters explained that, if adopted, the extraordinarily broad and unqualified authorization for the take of Larks on agricultural lands was not only unnecessary to conserve Lark habitat, but would inevitably pave the way for the Lark's ongoing deterioration rather than its conservation. *E.g.*, AR-15603, 15279, 16233. Two of the Service's own peer reviewers urged the agency to at least consider modifying the rule to make it more protective of Lark nests and young birds unable to escape mowing and other harmful activities. *See* AR-15076 (Altman review explaining that the proposed rule "provides extensive exemptions from take of lark if they

---

[8] *See also* AR-16226 (comments of Plaintiff Center explaining that the Lark "is presently in danger of extinction throughout all or a significant portion of its range due to its precarious population status and the ongoing threats to its habitat"); AR-15279 (comments of American Bird Conservancy explaining that the "proposed listing status category of Threatened rather than Endangered is not supported," including due to the Lark's vulnerability to stochastic events because of winter flocking behavior"); AR-15808 (comments of City of Portland Environmental Services "support[ing] the designation of Endangered under the ESA" because "[b]ased on the best available science and the threats currently facing this species, we believe that [Larks] are likely to become extinct").

Plaintiff's Summary Judgment Memorandum

were to be listed, but no conditions of reciprocity for required conservation actions to

warrant the exemption from take . . . This is not a sound approach to conservation in

general, and certainly not when you are trying to recover a rare species . . . ."); AR-15043

(Camfield peer review stating that, in light of the references "[t]hroughout the [proposed

rule] to the importance of the timing of land management," the Service should consider

conditioning the take exemption on the "conduct [of] activities (e.g., mowing) outside of

the critical nesting periods for [Larks]").[9]

### D.    THE FWS'S FINAL LISTING AS THREATENED AND ADOPTION OF A BROADER RULE 4(d) EXEMPTION THAN PROPOSED

Following receipt of the peer reviews and other comments, the FWS acknowledged

that, in addition to raising a "substantial" issue that the "4(d) rule, as proposed, will never

allow the lark to recover," "Bob Altman's peer review letter does present some new

information about the population trend of the lark in the Willamette Valley" that "needs to

be considered." AR-1171 (3/26/13 e-mail).[10]

However, rather than accept the analysis of the expert whose views the Service

solicited, the FWS elected to "in essence, peer review the peer review," AR-1171, by

---

[9] In contrast, comments submitted by the Oregon Farm Bureau—which the FWS asked the Bureau to submit because it "would be nice to hear some expressions of support from the organization for the special rule, *since we are doing it to help ag producers in the valley*," AR-1240 (emphasis added)—requested an even broader exemption on the grounds that "[w]hile the listed activities may encompass many 'routine' agricultural practices, they do not address all accepted and otherwise routine agriculture practices," such as "pesticide application." AR-15828.

[10] *See also id.* ("Bob, *who is apparently much more familiar with the BBS data*, dug into the records to conduct his own analysis of the trend of the lark for all Willamette Valley BBS routes with lark detections. *His analysis found an overall declining trend, with some routes showing statistically significant downward trends*.") (emphasis added); AR-1235 (4/4/13 meeting notes stating that "Peer Reviewer Robert Altman provided additional analysis of Oregon population data suggesting that [the Lark] may warrant Endangered status rather than the proposed Threatened").

Plaintiff's Summary Judgment Memorandum

asking a biologist with USGS's Patuxent Wildlife Research Center (John Sauer) to "look over the [Altman] peer review . . . and in particular, the reviewer's use of Breeding Bird Survey data to assess trends for the [Lark]" in the Willamette Valley. AR-1180; *id.* ("We are particularly interested in your feedback regarding this analysis, as we are not intimately familiar with BBS data"). In response, Dr. Sauer advised that, "[i]n my view, within the constraints of subspecies identification noted below, *the author is correctly describing the patterns of population change shown from BBS data*." AR-1318 (emphasis added). While noting certain limitations in the BBS data analyzed in the Altman review, Dr. Sauer stated that the review had "engaged in a reasonable use of the data" that was available, and that Dr. Sauer knew of "no additional route data" that the peer review had failed to consider or that "could potentially alter the outcome" of the analysis. AR-1314. As the FWS summarized in meeting notes, "Sauer's review acknowledges Altman's assessment is correct, but the level of uncertainty is high." AR-1320 (5/2/13 meeting notes).

In October 2013, the FWS published in the Federal Register a final regulation listing the Lark as threatened. AR-585. The final decision reaffirmed the finding in the proposal that Larks "in Washington are declining by 40 percent per year," AR-623, and have "reached a point where they are declining towards extinction . . . ." AR-632. With respect to the Willamette Valley, the FWS acknowledged its peer reviewer's "new analysis of the Breeding Bird Survey data" and its conclusion that the Lark population in the "Willamette Valley is declining at about 5 percent per year" and "has been declining steadily since the early 1990s." AR-596. Yet while stating that the "peer reviewer presented new information about the declining population of [Larks] in the Willamette Valley," which "provides us a more complete picture of the status of the subspecies," the

Service said that "we do not feel these data are sufficiently reliable to alter our conclusion regarding the status of the subspecies." *Id.*

As in its proposed rule, the FWS's final listing rule delineates a host of grave threats to the Lark's survival throughout its range, including in the Willamette Valley, and again stresses that the "fewer than 1,600 streaked horned larks rangewide" are subject to "potentially disastrous stochastic events, such as ice storms or flooding, that could . . . wipe out a substantial percentage of the entire subspecies." AR-626. At the same time, however, the FWS again concluded that listing as endangered is unjustified because "[w]e do not have information to suggest that the present threats are of such great magnitude that" the Lark in its entirety "is in immediate danger of extinction." AR-630. The Service again concluded that the Lark is not even endangered in a "significant portion of its range," AR-632, notwithstanding the dire status of the Washington portion of the range, because "even with the potential loss of the Washington population, the relatively larger population in the Willamette Valley of Oregon would likely persist." *Id.*

Along with the threatened listing, the Service published a 4(d) rule that not only omits any of the protections urged by peer reviewers and other commenters, but is even more sweeping than the proposed rule in authorizing activities on agricultural lands that may kill and otherwise take Larks, including during the breeding season. AR-636-37. The 4(d) rule provides that "[i]ncidental take of [Larks] will not be a violation of section 9 of the Act, if the incidental take results from accepted agricultural (farming) practices implemented on farms consistent with State laws on non-Federal lands." AR-607, 637. "Accepted agricultural (farming) practices include, but are not limited to . . . mowing, tilling, discing, burning, and herbicide application of crops." AR-637.

Plaintiff's Summary Judgment Memorandum

While again finding that agricultural practices such as mowing are beneficial to Larks only when measures are taken to minimize nest destruction and the killing of young birds, *see, e.g.*, AR-608 (explaining that the timing of mowing is *critical to determining whether this activity is harmful or beneficial to lark*s") (emphasis added), the 4(d) rule contains no protections for Larks whatsoever. Rather, although "acknowledging that the agricultural activities covered in the 4(d) rule are broad," the Service stated that "imposing a timing restriction would likely reduce the utility of the special rule *for land managers*," AR-598 (emphasis added), and "would allow landowners to continue managing the landscape in ways that meet the needs of their operations while simultaneously providing suitable habitat" for Larks. *Id*. The Service did not explain how habitat could be deemed "suitable" in the absence of any measures to protect essential *breeding* habitat. Nor, as before, did the agency proffer any evidence that adopting any such measures would preclude landowners from "meet[ing] the needs of their operations" or result in wholesale land "conversions" to "uses unsuitable for" the Lark. *Id*. To the contrary, along with the dearth of any measures for avoiding the destruction of nests, the rule imposes no restrictions at all on wholesale land conversions that are entirely inconsistent with the maintenance of Lark habitat.[11]

---

[11] In addition to exempting all agricultural practices from the take prohibition, the section 4(d) rule also exempts activities and impacts at airports, including activities designed to deter birds and other wildlife from using the airport as habitat, as well as incidental take caused by accidental aircraft strikes at airports on non-federal land. AR-636. Although Larks have used open spaces at airports, the Service's peer reviewer and others have noted the drawbacks in relying on airports as a "foundation for conservation of any bird species, let alone an ESA listed bird species." AR-15078 (Altman peer review) (explaining that "larks are at risk of mortality from plane collisions," that airports "often desire to manage against any wildlife to minimize potential conflicts," and that "[w]hen a bird strike does occur that results in damage to planes or injury to people, there is a subsequent concerted effort to eliminate the 'bird problem' whether larks were the source

## ARGUMENT

### I.    STANDARD OF REVIEW

Judicial review of agency action under the ESA is governed by the APA, which provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Ariz. Cattle Growers v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001). Although the APA standard is deferential, "judicial review is meaningless . . . unless [courts] carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Ariz. Cattle Growers*, 273 F.3d at 1236 (citation omitted). The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (citation omitted).

The Supreme Court has instructed that "[n]ormally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. An agency decision is not entitled to deference "when the agency's decision is without substantial basis in fact" or there is no "rational connection between the facts found and the determinations made." *Ariz. Cattle*

---

or not"); *see also* AR-15259 (comments of the Federal Aviation Administration urging that airports not be relied on as a focal point for the Lark's recovery efforts).

Plaintiff's Summary Judgment Memorandum

*Growers Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). Courts may not supply a "reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43 (citation omitted), nor otherwise "attempt to make up for deficiencies in the agency decision." *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1525 (9th Cir. 1995).

When an agency decision involves statutory construction and the agency has interpreted the statute in regulations carrying the force of law, courts apply the *Chevron* framework. *Ariz. Cattle Growers*, 273 F.3d at 1236-37 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). At *Chevron* step one, courts "decide independently" whether Congress has spoken to the specific question. *Id*. at 1237. If not, the court "defer[s] to any 'permissible' or 'reasonable' interpretation of the agency." *Id*. (quoting *Chevron*, 467 U.S. at 842). However, only "[a]n official, legally binding interpretation is entitled to *Chevron* deference." *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008). Courts apply a less deferential standard to "agency interpretations without the force of law," *id*. (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), and do not give any particular weight to the government's "litigation positions unmoored from any official agency interpretation." *Id*.[12]

---

[12] As set forth in the accompanying standing declarations, the Plaintiff Center for Biological Diversity, which has sought effective ESA protection for the Lark for many years, is a conservation membership organization with concrete recreational, aesthetic, scientific, and organizational interests in the Lark, and is therefore injured by the FWS's refusal to list the Lark as an endangered species, and the Service's adoption of a 4(d) rule that does nothing to conserve the subspecies. *See* Ex. A, B.

Plaintiff's Summary Judgment Memorandum

22

## II.    THE SERVICE'S REFUSAL TO LIST THE LARK AS ENDANGERED IS CONTRARY TO THE ESA AND ARBITRARY AND CAPRICIOUS.

As explained, the record establishes and the FWS itself has found that the Lark has suffered a precipitous decline in its range; that it is now reduced to only 1,600 or fewer birds scattered in a few small populations; that the species is in fact declining dramatically and faces extinction in the remaining Washington portion of its range; and that in the Willamette Valley, where fewer than 1,000 of the bird may remain, the Lark faces similar threats to those present in Washington and also grave risks from stochastic factors. Nonetheless, the Service concluded that the Lark is not "endangered" because it is not "in danger of extinction throughout all *or* a significant portion of its range." 16 U.S.C. § 1532(6) (emphasis added). That conclusion is arbitrary and capricious, and also contravenes controlling Circuit precedent and the plain terms of the ESA.

To begin with, the Court of Appeals, applying established principles of statutory interpretation, has held that the phrase "all or a significant portion of its range" must be construed in a manner that gives substantive meaning to the two distinct bases for listing embodied in the ESA's definitions of endangered and threatened species, i.e., because of Congress's use of "or" the FWS is precluded from "reading 'all' and 'a significant portion of its range' as functional equivalents." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) (rejecting an interpretation that rendered the phrase "significant portion of its range" "superfluous" because courts must "'give effect to *all* of [the statute's] provisions.'" *Id.* (quotation omitted).

In this case, the FWS's conclusion that the Lark is not endangered is legally defective for two overarching reasons. First, on the record here, the Service's finding that the Lark is not endangered in "all" of its range is arbitrary and capricious. Second, the

Plaintiff's Summary Judgment Memorandum

Service's finding that the Lark is not even endangered in a "significant portion of its range" flouts Circuit precedent by effectively reading that phrase out of the statute.

>A.    **THE FWS'S FINDING THAT THE LARK IS NOT ENDANGERED IN "ALL" OF ITS REMAINING RANGE IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO THE ESA.**

In its listing proposal, the FWS recognized that Larks in Washington "have reached a point where they are declining towards extinction" in the foreseeable future, AR-496, but the Service found that an endangered listing was unjustified because the "population of [Larks] in the Willamette Valley in Oregon appears to be more stable," although it "face[s] many of the same threats as populations in Washington," including "small population size, and likely loss of habitat to future development and incompatible management practices" on agricultural lands. *Id*. Even when the Service's own expert peer reviewer subsequently presented the agency with additional extensive data, previously unconsidered by the agency, demonstrating that the small Lark population in the Willamette Valley is *not* "stable"—but, rather, is *also* declining due to the serious threats identified in the proposal—the Service adhered to its position that an endangered listing is not warranted. *See supra* pp. 17-19. That conclusion is unsustainable on the record before the Court.

**First**, the FWS's own explanation for its decision is internally contradictory. On the one hand, the final rule asserts that the "apparent trend of the subspecies *is stable*" in the Valley and that the Lark "would likely persist" in the absence of the Washington populations, AR-632 (emphasis added)—thus reaffirming the rationale for rejecting an endangered listing set forth in the proposed rule. Yet at the same time the final rule concedes that the "population in Oregon *is also declining,* though at a less pronounced rate," AR-601 (emphasis added); that Larks "in the Willamette Valley *are declining*" due to ongoing threats and inadequate protections, AR-632 (emphasis added); that the Lark is

Plaintiff's Summary Judgment Memorandum

24

suffering a "downward trend *across its range*," AR-622 (emphasis added); and that the "BBS data from the Willamette Valley indicated that [Larks] *have been declining for decades*, which is coincident with the restrictions on grass seed field burning imposed by the Oregon Department of Agriculture." AR-593 (emphasis added).[13]

An internally contradictory agency finding on a critical issue renders the agency's decision arbitrary and capricious. *See, e.g.. Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (stating that an "unexplained inconsistency" in an agency's decision making process is grounds for holding an agency action arbitrary and capricious); *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1048, 1050 (9th Cir. 2010) (finding decision to authorize killing of sea lions arbitrary and capricious because the agency failed to proffer a satisfactory explanation for "apparent inconsistencies" between the agency's own factual findings and the rationale for the decision). Here, either the small Willamette population is in fact steadily declining due to the serious ongoing threats and inadequate protections identified in the final and proposed rules—which would strongly support a finding that the Lark is endangered in "all" of its range given the admittedly dire status of the Washington populations—*or* the Willamette Valley population is "stable" and will somehow "persist" when Larks are lost everywhere else. Both scenarios cannot simultaneously be true, and Circuit precedent dictates that the FWS "cannot avoid its duty to confront these inconsistencies by blinding itself to them." *Id.* at 1051.

**Second**, the Service's discounting of the new data in the Altman peer review as not "sufficiently reliable to alter our conclusion regarding the status of the subspecies"

---

[13] A ban on controlled burning of agricultural lands is harmful to Lark survival because it "render[s] [prairie] habitat unusable for . . . streaked horned larks" by facilitating the "invasion by nonnative grasses and woody vegetation . . . ."  AR-597, 609-10.

throughout all of its range, AR-597, violates the ESA's mandate that the agency must base

listing decisions "solely on the basis of the best scientific and commercial data *available* . .

. ." 16 U.S.C. § 1533(b)(1)(A) (emphasis added). "Courts have held that '[a] failure by the

agency to utilize the best available science is arbitrary and capricious." *Desert Survivors v.*

*U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1039 (N.D. Cal. 2018) (quoting *Consol.*

*Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1060 (E.D. Cal. 2010)). The "best available"

data standard "'prohibits [the Service] from disregarding available scientific evidence that

is in some way better than the evidence [it] relies on.'" *San Luis & Delta-Mendota Water*

*Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (quoting *Kern Cty. Farm Bureau v.*

*Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006)).

      Here, the Service improperly discounted the best available data, proffered by the

agency's own expert peer reviewer, pointing to significant declines in the Willamette

Valley population—data that are entirely consistent with the Service's *own* findings

regarding the serious ongoing threats and inadequate protections in the Valley. *See, e.g.*,

*Ctr. for Biol. Diversity*, 900 F.3d at 1068-69 (holding that in refusing to list the Arctic

Grayling, the FWS acted arbitrarily and capriciously by "ignoring available biological data

showing that the arctic grayling population in the Big Hole River was declining"); *Ctr. for*

*Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. C04-04324 WHA, 2005 WL

2000928, at *14 (N.D. Cal. Aug. 19, 2005) (rejecting the FWS's downlisting of salamander

populations from endangered to threatened where the "FWS's own scientific review team

strongly supported the 'endangered' status" of the populations); *Defenders of Wildlife v.*

*Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997) (rejecting the FWS's refusal to list the

Canada lynx, contrary to the views of its own experts, explaining that "[a]lthough the Court

Plaintiff's Summary Judgment Memorandum

must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts.").

**Third**, the FWS's proffered justification for discounting the Altman data and analysis compounds the arbitrary and capricious nature of its decision making. Rather than find that the data are not the best *available* regarding the Lark's status in the Willamette Valley, the final rule asserts that they are not "*sufficiently* reliable to alter our conclusion regarding the status of the subspecies" AR-597 (emphasis added), and that, according to the USGS biologist who was asked to "peer review the peer review," AR-1171, there is a "high level of uncertainty" in the BBS data Altman analyzed. AR-597. But the fact that the best available information may not be as rigorous as the FWS would prefer does not, under the standard dictated by the ESA, permit the FWS to discount that information. Indeed, even where the best available information is "quite inconclusive," the Service "*must* [] still rely on it" in making a listing decision. *Sw. Center for Biol. Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (emphasis added).

Moreover, as explained previously, the USGS scientist who reviewed the Altman analysis did *not* disagree with the peer reviewer's ultimate conclusion; nor did he say that the information was too unreliable to be relied on by the FWS. *See supra* p. 18. Rather, Dr. Sauer opined that "the author [Altman] *is correctly describing the patterns of population change shown from BBS data*," AR-1318 (emphasis added); that the Altman review had "engaged in a reasonable use of the data"; and, most important, that there was "no additional route data" available that "could potentially alter the outcome" of the analysis. AR-1314. Consequently, as the FWS itself recognized when it received the USGS analysis, while Sauer pinpointed certain limitations in the available data, his "review acknowledges Altman's assessment [of the data] *is correct*." AR-1320 (emphasis added).

Plaintiff's Summary Judgment Memorandum

In short, *both* the FWS's own expert peer reviewer and *that* reviewer's peer reviewer agreed that the best available data in fact reflect a declining population in the Willamette Valley, contrary to the premise of "stability" underlying the Service's proposal to list as threatened rather than endangered. The Service therefore violated the ESA's best available science standard by discarding that data as not "sufficiently reliable to alter our conclusion regarding the status of the subspecies." AR-597; *see also Greater Yellowstone Coal., Inc. v. Servheen,* 665 F.3d 1015, 1028 (9th Cir. 2011) (holding that it was arbitrary and capricious "for the Service to simply invoke 'scientific uncertainty'" as the basis for its decision to delist the Yellowstone grizzly bear population); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. C 16-06040 WHA, 2018 WL 4538622, at * 6 (N.D. Cal. Sept. 21, 2018) (explaining that "[o]ur court of appeals has addressed how scientific 'uncertainty' should be evaluated in listing decisions" and made clear that the Service "simply stating that the impact was 'uncertain' was insufficient").[14]

**Fourth**, the Service's reasoning cannot pass muster under Circuit precedent even apart from the refusal to rely on the new information in the Altman peer review. Again, while characterizing the Washington portion of the Lark's range as rapidly "declining towards extinction," AR-632, the Service's final rule asserts that the Willamette Valley population "would likely persist" in the absence of the Washington portion. *Id*. But while discounting the BBS data as having a "high level of uncertainty," AR-597, the Service in no way supported its finding that the Valley population "would likely persist" either in the near or long-term. To the contrary, the final rule acknowledges myriad severe threats *to that very population* that are impossible to reconcile with the assertion of likely

---

[14] The final rule erroneously suggests that multiple "scientists" at USGS reviewed the Altman peer review. AR-596-97. Dr. Sauer was the only one who did so.

Plaintiff's Summary Judgment Memorandum

persistence— including, e.g., a "small population size" of only 900-1,300 birds, AR-632; a "likely loss of habitat to future development," *id*.; "incompatible management practices," particularly those that kill eggs and nestlings and otherwise destroy and disrupt breeding, *id*.; the "lack of essential habitat protection under State laws [that] leaves [the Lark] at continued risk of habitat loss and degradation in . . . Oregon," AR-622; and the Lark's extreme "vulnerability to stochastic (random) natural events" in the Willamette Valley in particular. AR-625.

     As for the latter threat, the final rule stresses that it is most dire in the winter, when much of the remaining population concentrates in the Valley, and

> [s]uch concentration exposes the wintering populations to *potentially disastrous stochastic events, such as ice storms or flooding, that could kill individuals or destroy limited habitat;* ***a severe weather event could wipe out a substantial percentage of entire subspecies . . . [T]he small and declining population of [Larks] is certainty at risk of random environmental events that could have catastrophic consequences***.

AR-626 (emphasis added).

     The FWS's assumption of "likely persist[ence]" in the Willamette Valley, while the agency simultaneously acknowledges myriad ongoing threats—including those that could prove "disastrous" and "catastrophic" at *any* time—is arbitrary and capricious decision making of the kind that the Ninth Circuit has repeatedly denounced in the Service's listing decisions. *See Greater Yellowstone Coal.*, 665 F.3d at 1020 (holding that it was arbitrary and capricious for the FWS to assume "stability" of the Yellowstone grizzly bear population in the face of an ongoing threat to the species in the form of a declining food source); *id*. at 1030 (explaining that the "lack of any data showing a population decline due to whitebark pine loss is not enough" where the Service had presented "no data indicating that whitebark pine declines will not threaten the Yellowstone grizzly population"); *Tucson*

Plaintiff's Summary Judgment Memorandum

*Herpetological Soc'y v. Salazaar*, 566 F.3d 870, 878-79 (9th Cir. 2009) (rejecting the

FWS's assumption that a lizard population was "stable" and would "persist" based on

"limited and inconclusive" population studies; "[i]f the science on population size and

trends is underdeveloped and unclear, the [FWS] cannot reasonably infer that the absence

of evidence of population decline equates to evidence of persistence"); *Ctr. for Biological*

*Diversity*, 2018 WL 4538622, at *9 (holding that the FWS "arbitrarily and capriciously

relied on" "'limited and inconclusive'" population studies to "conclude Pacific fisher

population stability") (citing *Tuscon Herpetological Society*).[15]

     In sum, the FWS's finding that the Lark is not endangered in "all" of its range—

because of its purported persistence in the Willamette Valley—is internally contradictory,

violates the ESA's "best available" evidence standard, contravenes Circuit precedent, and

"runs counter to the evidence before the agency." *State Farm*, 566 F.3d at 878.

---

     [15] The final listing rule acknowledges that "no population modeling" has been done using data from Oregon but asserts that the "apparent trend of the subspecies is stable, based on the Oregon Department of Fish and Wildlife's ["ODFW"] 1996 and 2008 surveys for [Larks] at sites throughout the Willamette Valley." AR-632. That assertion is contradicted by the ODFW itself. Because the FWS biologist drafting the Lark rule acknowledged that "I don't know how to compare the Oregon studies to the Washington work, or how to summarize the trends in the two states," the biologist asked Randy Moore, a scientist with ODFW, for "any help in describing the lark's population trends in Oregon, and some thoughts about how to characterize the lark's overall population status." AR-6241. Dr. Moore's response—provided before the Altman peer analysis of the BBS data— was that "*we have no population trend data for Oregon*" and that, while surveys performed at certain sites reflected "no decline like Washington has seen at some of its sites," "[t]his *is not to say that populations are stable in the Valley – that's a jump, again, that we can't make from these observations.*" *Id.* (emphasis added). Moore also explained that "[t]he sites we use to study [Larks] here are population centers *that may be the last places that population declines will show if they're happening.*" *Id.* (emphasis added); *see also Tucson Herpetological Soc.*, 566 F.3d at 879 (finding that the FWS acted arbitrarily by drawing a conclusion of persistence that was contrary to the study author's own analysis).

Plaintiff's Summary Judgment Memorandum

**B.    AT MINIMUM, THE FWS'S CONCLUSION THAT THE LARK IS
NOT ENDANGERED IN A "SIGNIFICANT PORTION OF ITS
RANGE" VIOLATES THE ESA AND CIRCUIT PRECEDENT.**

If the Court sustains Plaintiff's arguments concerning the Lark's status in "all" of
its range, the Court need not address whether the Lark is endangered in a "significant
portion of its range" ("SPR"). In any event, the FWS's reasons for finding that the Lark is
not even endangered in an SPR are impossible to harmonize with the plain language of the
ESA or Circuit precedent construing that language.

Because the FWS indisputably found that the Lark is "in danger of extinction" in
the entire Washington portion of its remaining range, 16 U.S.C. § 1532(6), the critical
question (for SPR purposes) is whether that constitutes a "significant portion." In
answering that question, the FWS employed the following "test": whether, if the
Washington populations "were lost, *the entire subspecies would be in danger of
extinction*." AR-632 (emphasis added). The Service then found that, "even with the
potential loss of the Washington populations, the relatively larger, population in the
Willamette Valley would likely persist; *therefore the subspecies as a whole is not presently
in danger of extinction, and therefore does not meet the definition of an endangered
species*." *Id*. (emphasis added).

On its face this explanation does exactly what the Court of Appeals has held the
Service may not do—i.e., it reads the "significant portion of its range" language in such a
manner as to "render[] the phrase superfluous." *Defenders of Wildlife*, 258 F.3d at 1142. If
the "subspecies as a whole," AR-632, is "presently in danger of extinction, then the Lark is
endangered in "*all*" of its range. The approach applied in the final rule therefore renders the
phrase "*or* a significant portion of its range" entirely "redundant," in contravention of the
rule of construction that statutory language cannot be rendered meaningless. *See Defenders*

Plaintiff's Summary Judgment Memorandum

*of Wildlife*, 258 F.3d at 1142 (explaining that "[w]hen interpreting a statute, we must

follow a 'natural reading . . . , which would give effect to *all* of [the statute's] provisions'")

(quoting *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*,

517 U.S. 544, 549 (1996)). By "reading 'all' and a "significant portion of its range' as

functional equivalents, the [FWS's] construction violates that rule." *Id.*[16]

The Lark rule contains no explanation of *why* the FWS decided to apply this test for

assessing what is a "significant portion of [the Lark's] range"—which itself affords a basis

for vacating and remanding the decision. "The Supreme Court has 'frequently reiterated

that that an agency must cogently explain why it has exercised its discretion in a given

manner.'" *Crickon v. Thomas*, 579 F.3d 978, 985 (9th Cir. 2009) (quoting *State Farm*, 463

U.S. at 48). This is "what the [FWS] failed to do" here, *id.*, by providing "no indication of

the basis on which" the agency had concluded that the Washington portion of the Lark's

range could be deemed "significant" *only* if the loss of that portion would render the *entire*

species in danger of extinction. *Burlington Truck Lines Inc. v. United States*, 371 U.S. 156,

167 (1962).

Although the FWS failed to explain during the Lark rulemaking why it was

applying this approach to defining significance, the test applied by the Service in fact

mirrored a novel interpretation of the ESA the Service was considering while the Lark

rulemaking was in progress. In December 2011—before the Lark proposal was

published—the Service proposed for public comment a *Draft Policy on Interpretation of

the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions*

---

[16] *See also Nat'l Ass'n of Mfrs. v. Dep't of Defense*, __ U.S. __, 138 S Ct. 617, 629,
630 (2018) (rejecting an interpretation of the Clean Water Act that "renders other statutory
language superfluous" and reads words "out of the statute . . . [T]his Court is not free to
'rewrite the statute' to the Government's liking.") (quotation omitted).

Plaintiff's Summary Judgment Memorandum

of 'Endangered Species' and 'Threatened Species,' 76 Fed. Reg. 76,987 (Dec. 9, 2011)

("Draft SPR Policy"). As relevant here, the draft policy proposed a definition of

"significant" that is functionally identical to the one employed for the Lark, i.e., "a portion

of the range of a species is 'significant' if its contribution to the viability of the species is

so important that without that portion, the species would be in danger of extinction." *Id.* at

77,002. In July 2014—after the Lark decision was published—the FWS issued a final rule

adopting, with minor variation, the same definition. *See Final Policy on Interpretation of*

*the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions*

*of 'Endangered Species' and 'Threatened Species,'"* 79 Fed. Reg. 37,578, 37,609 (July 1,

2014) ("Final SPR Policy").[17]

　　　　However, two federal courts in the Ninth Circuit have recently ruled that this

definition is not a permissible construction of the ESA, including because it disregards the

plain terms of the statute in the manner that the Ninth Circuit rejected in *Defenders of*

*Wildlife*. In *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 957-958 (D. Ariz.

2017), Judge Marquez considered both a facial challenge to the definition of significance in

the Final SPR Policy as well as whether the FWS violated the ESA by applying the Draft

SPR Policy to the cactus ferruginous pygmy owl ("pygmy- owl"). Applying the *Chevron*

framework to the Final SPR Policy, the court held that the FWS's test for significance

could not, under Circuit precedent, be deemed a permissible construction of the ESA

because "far from ensuring that the 'significant' and 'all' language of the ESA will retain

---

[17] The Final SPR Policy provides that a "portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." 79 Fed. Reg. 37,578, 37,609.

independent meaning" as mandated by *Defenders of Wildlife*, the Service's approach

"actually ensures that a portion of a species' range will never be considered significant

based on accurate application of the Final SPR Policy." *Id*. at 957. The court further

explained that the Service improperly

> chose a definition of significance that renders the SPR language superfluous by
> limiting it to situations in which it is unnecessary. 'Whatever the outer limits of the
> range of permissible constructions' of the ESA, the Court is 'certain that what lies
> beyond them' is an interpretation that renders key statutory language meaningless
> and redundant in order achieve a goal at odds with the purposes of the statute.

*Id*. at 958 (quoting *Natural Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421

F.3d 872, 881 (9th Cir. 2005)); *see also id*. ("The SPR interpretation set forth in the Final

SPR Policy impermissibly clashes with the rule against surplusage and frustrates the

purposes of the ESA.").

With regard the pygmy-owl decision, Judge Marquez considered whether the

*Chevron* framework applied because the Draft SPR Policy in force when the pygmy-owl

decision was made (and when the Lark decision was made) was "not an agency rule

carrying the force of law" and, "indeed, in publishing notice of the policy, the Service

specified that the policy was not final and would be treated by the agency only as

'nonbinding guidance' during the notice-and-comment period." 248 F. Supp. 3d at 959

(quoting 76 Fed. Reg. at 76,002). The court concluded that:

> in the end, it matters little whether the deferential framework applicable to the Draft
> SPR Policy stems from *Chevron* or *Skidmore*, because the SPR interpretation set
> forth in that policy suffers from the same fundamental defect as the SPR
> interpretation in the Final SPR Policy . . . The Draft SPR Policy, like the Final SPR
> Policy, impermissibly renders the SPR language of the ESA superfluous by limiting
> it to situations in which it is unnecessary.

*Id*.[18]

---

[18] The court vacated and remanded the Final SPR Policy and the pygmy-owl
decision. 248 F. Supp. 2d at 359. The court denied the government's Rule 59(e) motion on

Plaintiff's Summary Judgment Memorandum

In *Desert Survivors v. U.S. Dep't of the Interior*, , which challenged the Final SPR

Policy on its face and as applied to the bi-state sage grouse, Judge Spero "agree[d] with

Judge Marquez's reasoning" and likewise "conclude[d] that the definition of 'significant'

in the SPR Policy is an impermissible interpretation of the [SPR] language in the ESA."

321 F. Supp. 3d at 1073-74. The court subsequently "vacat[ed] and set[] aside the

'significant portion' part of the SPR Policy that it found to be unlawful in its summary

judgment order." *Desert Survivors v. U.S. Dep't of the Interior*, No. 16-cv-01165-JCS,

2018 WL 4053447, at *4 (N.D. Cal. Aug. 24, 2018).[19]

For the same reasons, this Court should reject as contrary to the ESA and Circuit

precedent the test applied by the FWS in finding that the Washington portion of the Lark's

range is not an SPR. The test impermissibly reads the SPR language out of the statue, flies

in the face of *Defenders of Wildlife,* and thus is arbitrary, capricious, and contrary to law.

Finally, even under the now-vacated approach embodied in the SPR Policy, it was

arbitrary and capricious for the FWS to find that the Washington portion of the range was

not an SPR. One of the specific examples in the Draft SPR Policy of where a portion

*should* be deemed significant is where a species has "two main populations," one of which

is facing "severe threats" to its continued existence and the other is "so small or

homogeneous *that a stochastic (i.e., random, unpredictable, due to chance) event could

devastate the area and the population inhabiting it*." 76 Fed. Reg. at 76,995 (emphasis

---

the merits while limiting the vacatur of the Final SPR Policy to Arizona and specifying that
the vacatur applied only to the definition of "significant" in SPR. *See Ctr. for Biological
Diversity v. Jewell*, Case No. 14-2506, ECF No. 81. The government filed but then
dismissed its notice of appeal. *See* 2018 WL 3155693 (Feb. 12, 2018).
    [19] Because Judge Spero's vacatur is nationwide, *see* 2018 WL 4053447, at *2, there
is no extant FWS interpretation that could be afforded *Chevron* deference.

Plaintiff's Summary Judgment Memorandum

added). As explained, that scenario describes the Lark's predicament precisely and in fact

means that the Lark is endangered in "all" of its range. *See supra* p. 29.

### III.    THE 4(d) RULE IS CONTRARY TO THE ESA AND ARBITRARY AND CAPRICIOUS.

Even if the FWS had a lawful and non-arbitrary basis for finding the Lark

threatened rather than endangered—which it did not—its section 4(d) rule for agricultural

lands cannot pass muster. Section 4(d) of the ESA—which is entitled "Protective

Regulations"—provides that the Service "*shall* issue such regulations as [it] deems

necessary and advisable to *provide for the conservation*" of threatened species. 16 U.S.C. §

1533(d) (emphasis added). The FWS therefore has a "non-discretionary duty to ensure"

that any section 4(d) regulations it issues for a threatened species, including any regulation

that delineates when  "take" of the species may occur, will in fact "provide[] for the

conservation" of the species. *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1117

(D. Ariz. 2009).

"It is well settled that the starting point for interpreting a statute is the language of

the statute itself." *Olympic Forest Coalition v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th

Cir. 2018) (quotation omitted). Here, "conservation" is expressly defined by the ESA to

mean recovery to the "point at which the measures provided pursuant to the [ESA] are no

longer necessary." 16 U.S.C. § 1532(3). "The meaning of a statutory provision is also

determined by placing the language in context—both the specific context in which it is

used and the broader context of the overall statute." *Olympic Forest Coalition*, 884 F.3d at

906 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "'Conservation,' also

referred to as 'recovery,' is the heart of the ESA." *Ctr. for Biological Diversity v. Jewell*,

No. CV-15-00019-TUC-JGZ, 2018 WL 1586651, at *3 (D. Ariz. Mar. 31, 2018). As the

Plaintiff's Summary Judgment Memorandum

Court of Appeals has explained, the "ESA was enacted not merely to forestall the extinction of species (i.e., promote a species' survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot*, 378 F.3d at 1070. The ESA's overriding conservation/recovery purpose "'is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *Hill*, 437 U.S. at 184).

Consequently, the plain language of the ESA "requires the [Service] to provide for the conservation of species, *which includes recovery*, when promulgating regulations in accordance with Rule 4(d)." *Native Fish Soc'y v. Nat'l Marine Fisheries Servs.*, 992 F. Supp. 2d 1095, 1115 (D. Ore. 2014) (emphasis added). Although the Service has discretion to issue the 4(d) regulations it deems "necessary and advisable," that discretion is cabined by the overarching requirement that the "regulation 'shall' provide for the conservation of such species." *Defenders of Wildlife*, 607 F. Supp. 2d at 1116-17; *see also Sierra Club v. Clark*, 755 F.2d 608, 612-13 (8th Cir. 1985) (explaining that the Service's discretion to issue regulations under section 4(d) is "limited by the requirement that the regulations [it] is to issue must provide for the *conservation* of threatened species"); AR-11496 (acknowledgement by the Service that a 4(d) rule can only be invoked if it "would not adversely affect recovery and if the reduced protection would not slow the species' recovery").

The 4(d) rule for agricultural lands—which exempts from the ESA's take prohibition any and all "agricultural (farming) practices implemented on farms consistent with State laws on non-Federal lands," AR-637—does not satisfy the ESA's conservation/recovery mandate. Indeed, a rule that does not impose even the most modest conditions designed to protect Larks during the breeding season but, instead, means that

Plaintiff's Summary Judgment Memorandum

37

eggs and chicks in occupied nests inevitably will be mowed, plowed, and abandoned by

adults, is the antithesis of facilitating the recovery of the Lark in its remaining dwindling

habitat.

This is made crystal-clear by the FWS's own listing rule. Again, the Service found

that activities such as mowing "outweigh[] the negative impact of those activities" *only*

"[w]hen the recommended timing restrictions are observed" because "improperly timed

actions can destroy nests and young." AR-612; *see also* AR-6288 (exchange of e-mails

between FWS biologists recognizing that "the primary threat of mowing is timing and

direct mortality" and that "mowing can be a threat depending on the timing" because "[i]f

it occurs during the breeding season, it can kill eggs, young, and even adults"). Further, the

FWS found that *existing* agricultural practices and regulation of them in the Willamette

Valley "*are not sufficient to protect or maintain habitat on agricultural lands for the long-*

*term sustainability of streaked horned lark populations*." AR-601 (emphasis added).[20]

A 4(d) rule that ratifies a status quo that is *admittedly* inadequate to "protect or

maintain habitat . . . for the long-term sustainability" of the Lark, AR-601, and that the

Service concedes could result in "land managers . . . eliminat[ing] [Larks] from a site" that

is vital to their survival, AR-602, is not a rule that is even designed to prevent the

---

[20] Tellingly, when reviewing the final rule, the Service's own "HQ" (headquarters) pointed out that this finding of inadequate protections in the Valley "seems at odds with the 4(d) rule provisions that exempt take of larks on ag lands as a result of routine practices (and routine practices imply continued ag use)." AR-5964. The Service never reconciled this patent inconsistency. To the contrary, when peer reviewer Altman urged the agency to at least consider conditioning the 4(d) rule on "some degree of change to the way those [agricultural] lands are managed" because "all indications point to the likelihood that larks are not doing well on those lands," AR-3166, the State Supervisor of the Oregon FWS field office, which oversaw the rulemaking, stated that "[w]e *agree that some changes to ag practices are needed*" in the Valley, but he did not explain how the blanket 4(d) rule would or possibly could bring about such changes. AR-3175 (emphasis added).

Plaintiff's Summary Judgment Memorandum

*extinction* of the Lark, much less bring about its *recovery*. *See Ctr. for Biol. Diversity,* 2018 WL 1586651, at *15 (holding that the FWS failed to "adhere[] to the ESA's conservation purpose" with regard to a reintroduction program for the Mexican Wolf where the Service "repeatedly recognized that one of the chief threats to the species is loss of genetic diversity" and yet allowed expansive take of the wolf without adopting "protections for loss of genetic diversity").[21]

The final rule never explains how a 4(d) rule that fails to provide for even the slightest steps to conserve the Lark could possibly bring about the changes that the FWS itself said were necessary, let alone be deemed a "conservation" rule. Instead, the Service justified the rule on the grounds that "[w]hile some agricultural activities may harm or kill individual [Larks], maintenance of extensive agricultural lands in the Willamette Valley is crucial to maintaining the population" of Larks, and the rule "will further conservation of the subspecies by discouraging conversions of the agricultural landscape into habitats unsuitable" for the Lark. AR-634. This rationale is unsustainable.

First, the FWS did not present *any* evidence that conditioning the 4(d) exemption on even the most basic of measures to protect Larks during the breeding season—such as ascertaining whether Larks are nesting in a particular location and timing mowing activities to protect that area to the extent practicable—would prompt farmers to "convert" their lands to entirely "unsuitable" habitats. *See Ariz. Cattle Growers*, 606 F.3d at 1163 (explaining that courts do not defer to an agency's decision that is "without substantial

---

[21] *Compare Native Fish Soc'y*, 992 F. Supp. 2d at 1115 (finding that a 4(d) rule provided for recovery of threatened fish by requiring that a hatchery's artificial propagation program be operated pursuant to a hatchery genetic management program approved by the federal government); *Ctr. for Biological Diversity*, 2005 WL 2000928, at *11(sustaining a 4(d) rule for the tiger salamander that "did expressly prohibit two specific types of ranching practices" that were found to impede the salamander's recovery).

Plaintiff's Summary Judgment Memorandum

basis in fact"). Second, the Service's rationale makes no sense because, without the

expansive 4(d) rule, rendering occupied Lark habitat "unsuitable" for the Lark would itself

constitute a "take" requiring FWS authorization. *See* 50 C.F.R. § 17.3 (defining "harm" in

the "take" definition to encompass adverse "habitat modification or degradation").

On the other hand, the sweeping 4(d) rule *does* permit conversion to entirely

"unsuitable" habitat—including that which would foreclose breeding *entirely*—so long as

it entails any "accepted" agricultural practices "consistent with State laws on non-Federal

lands," AR-637—i.e., the very "State laws" that the FWS admits have proven *inadequate*

to protect Lark habitat.  Such agricultural practices include conversion of land to row

crops, blueberry fields, or vineyards that are wholly unsuitable for the Lark.  Consequently,

the 4(d) rule not only stands the ESA's "conservation" mandate on its head, it does not

satisfy even rudimentary APA standards. *See Humane Society*, 626 F.3d at 1051

(explaining that an agency must "articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made'") (quoting

*State Farm*, 463 U.S. at 43).

## IV.    THE APPROPRIATE REMEDY

The Court should remand the FWS's decision not to list the Lark as endangered

while leaving the threatened listing in place pending the Service's decision making on

remand. *See Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir.

2015) (explaining that courts may remand without vacating agency action when doing so

would avoid "environmental harm"). The Court should vacate the unlawful 4(d) rule

regarding agricultural lands so that during the remand of the listing issue the Lark would

receive the protection against unauthorized take that would have applied in the absence of

the 4(d) rule. A Proposed Order embodying this relief is attached.

40

Plaintiff's Summary Judgment Memorandum

Respectfully submitted,

/s/Eric R. Glitzenstein

Eric R. Glitzenstein
Admitted Pro Hac Vice
eglitzenstein@meyergliz.com

/s/Nick Lawton

Nick Lawton
Oregon Bar No. 143685
nlawton@meyerglitz.com

Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C.  20016
(202) 588-5206

Counsel for Plaintiff

41