EXHIBIT A IN SUPPORT OF PLAINTIFF'S

MOTION FOR SUMMARY JUDGMENT

Eric R. Glitzenstein (D.C. Bar No. 358287) (admitted pro hac vice)
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C. 20016
Telephone: (202) 588-5205
Facsimile: (202) 588-5049
Eglitzenstein@meyerglitz.com

Attorney for Plaintiffs

IN THE UNITED STATES DISRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiff, <br><br> v. <br><br> RYAN ZINKE, Secretary, U.S. Department of the Interior, *et al.*, <br><br> Defendants. | No. 3:18-cv-00359-MO <br><br> DECLARATION OF NOAH GREENWALD |

**DECLARATION OF NOAH GREENWALD**

I, Noah Greenwald, declare as follows:

1. I am a member of and the Endangered Species Director at the Center for Biological Diversity ("the Center"), a Plaintiff in this case. I am submitting this declaration in support of Plaintiffs' Motion for Summary Judgment.

2. The Center is a nonprofit organization committed to the preservation, protection, and restoration of native species and the ecosystems upon which they depend through science, policy, education, and environmental law. The Center has offices throughout the United States, including in Arizona, the District of Columbia, New Mexico, California, Alaska, Minnesota, Vermont, Florida, Oregon, and Washington. The Center has more than 63,000 members and over 1.6 million online supporters.

3. The Center believes that the welfare of human beings is deeply linked to nature and to the existence in our world of a vast diversity of wild animals and plants. Because diversity has intrinsic value, and because its loss impoverishes society, the Center works to secure a future for all species, great and small, hovering on the brink of extinction through science, law and creative media, with a focus on protecting the lands, waters and climate that species need to survive. The Center strives to protect its members' and supporters' recreational, aesthetic, scientific and educational interests in protecting and preserving imperiled species and biological diversity for future generations through its numerous organizational programs.[1]

4. One such program, the Center's Endangered Species Program, which I oversee, is specifically focused on: compiling and analyzing data about species status and recovery; submitting legal petitions and preparing reports, filing lawsuits when necessary, using the leverage of our supporters' voices and ensuring that imperiled species are federally protected; obtaining adequate amounts of critical habitat for species; advocating for sound conservation policy; watchdogging Congress and government agencies; and using creative media to keep the Center's members informed and engaged.[2] The Center's Endangered Species Program has been more successful than all other U.S. conservation groups *combined* in achieving first-time protection (i.e., listing) under the ESA for imperiled plant and animal species.[3]

5. To that end, the Center systematically and ambitiously uses biological data, legal expertise, and the Endangered Species Act's ("ESA") citizen petition process to obtain sweeping, legally binding new protections for imperiled animals, plants, and their habitat. The Center has achieved ESA protection for hundreds of species as a result of its groundbreaking petitions, lawsuits, policy advocacy, and outreach to media. The Center

---

[1] *See* http://www.biologicaldiversity.org/programs/.

[2] *See* http://www.biologicaldiversity.org/programs/biodiversity/index.html.

[3] *Id.*

employs a full-time staff of dozens of prominent environmental lawyers and scientists who work exclusively on its campaigns to save species and the places they need to survive. Additionally, the Center disseminates scientific and educational information in its various publications, including *Endangered Earth Online*, a weekly e-newsletter, as well as periodic reports detailing the current threats to imperiled species and biodiversity as well as the success stories of recovered and recovering species.[4]

6. One of the imperiled species on which the Center has spent many years and devoted significant resources is the streaked horned lark (hereafter the "Lark"). Indeed, without the Center's longstanding advocacy the Lark would not have gained any protection under the ESA. In 2002, the Center submitted the formal listing petition that ultimately led to the Lark's listing. The petition detailed the extensive contraction of the Lark's historic range, the ongoing loss and degradation of the Lark's habitat, and the myriad threats to its continued existence. Although the FWS agreed with the Center that listing of the Lark was warranted—and that it faced "imminent threats of a high magnitude"—the Service took no concrete action towards listing until the Center sued the agency for failing to make ESA listing decisions concerning the Lark and many other imperiled species in a timely fashion. In settling that lawsuit, the FWS agreed to be bound by enforceable deadlines for making proposed and final listing decisions for the Lark. *See In re Endangered Species Act Section 4 Deadline Litigation*, No. 1:10-mc-00377-EGS, ECF No. 42-1 (Stipulated Settlement Agreement) (July 12, 2011 D.D.C.).

7. In 2012, the FWS proposed listing the Lark as a threatened rather than an endangered species, and also proposed an expansive "special rule" pursuant to section 4(d) of the ESA that would broadly authorize the killing and other forms of "take" of Larks associated with agricultural and other activities. In response, I submitted extensive comments on behalf of the Center. I explained that the Lark's dire status in Washington along with evidence of the Lark's decline and inadequate protection in the Willamette

---

[4] *See* http://www.biologicaldiversity.org/publications/.

Valley in Oregon strongly supported listing the Lark as endangered. My comments on behalf of the Center's also explained that the proposed section 4(d) rule was not a "conservation" rule within the meaning of the ESA, including because it would not help to recover the Lark on agricultural (or other) lands but, rather, would merely maintain the same practices that have resulted in the Lark's precipitous decline.

9. The longstanding interests of the Center and its members in conserving the Lark and its habitat are gravely injured by the FWS's refusal to list the Lark as an endangered species and its adoption of a 4(d) rule that contains no conditions for minimizing adverse impacts to Larks during the breeding season. In particular, we are harmed by the FWS's failure to provide fairly modest but critical protections for the Lark during the nesting season. Like many ground nesting birds, which are in widespread decline across North America, the lark is vulnerable to plowing, mowing, and other activities that crush or disturb nests. Identifying and protecting small areas around nests during the short period of time the birds are on the nest would go a long way to helping the species recover, as such measures have for other threatened or endangered birds.

10. The Center has an office in Portland, Oregon, and members, board members, and staff of the Center reside in the Pacific Northwest and regularly seek to observe the dwindling population of Larks in the Washington and Oregon portions of the subspecies' range. Thus, the FWS' refusal to list the Lark as endangered and the Service's adoption of a broad 4(d) rule that does nothing to arrest the Lark's decline harms the Center's members', board members', and staff's educational, scientific, aesthetic, and recreational interests in observing the Lark in Washington and Oregon as the Lark dwindles in numbers and becomes increasingly difficult to see and enjoy. The Service's actions also greatly increase the likelihood that the Lark will become extinct, which poses an existential threat to the interests of the Center's members, board members, and staff in the Lark.

10. As detailed above, for much of the past two decades the Center has expended substantial organizational resources in attempting to obtain needed ESA

protections for the Lark, on behalf of the Center's members, board members, and staff. The FWS's refusal to list the Lark as endangered and adoption of a 4(d) rule that fails to conserve the Lark means that the Center has had to, and will continue to have to, spend additional resources that would not otherwise have been necessary, including in monitoring the Lark's status, educating the public and policymakers concerning the Lark's inadequate protection notwithstanding its listing under the ESA, working with Lark experts to devise measures for conserving the species, and advocating for essential safeguards that the Lark continues to lack due to the Service's inadequate protection under the ESA. The resources that the Center must continue to spend on the Lark as a direct result of the FWS's refusal to afford the Lark the protections it needs and to which it is legally entitled are resources that the Center will be unable to spend on other critical components of its mission to prevent extinctions and save the nation's biodiversity for future generations.

11. As noted, I am a member of the Center as well as an employee of the organization. I became a member because the Center is in my view the most effective organization in the country working on biodiversity issues and I have a longstanding personal and professional interest in saving imperiled species from extinction and bringing about their recovery. In particular, I have aesthetic, recreational, professional, and scientific interests in the Lark. I first viewed the streaked horned lark on August 28, 2015, on Livermore Road on the Baskett Slough National Wildlife Refuge on a trip to see them with Bob Altman (who is one of the leading experts on the species and was the FWS's hand-picked peer review on the listing rule). The Baskett Slough Refuge is in the Willamette Valley in Oregon. On this trip we were fortunate enough to observe two Larks in a patch of what appeared to be native vegetation surrounded by farm fields. I had previously looked for streaked horned larks on Port of Portland land in north Portland and I have since looked for them in north and northeast Portland on multiple occasions while birding. I regularly engage in birdwatching in Oregon and Washington and will continue to make regular efforts to observe Larks in the future. I anticipate doing so at

least once a year. As a result, my personal as well as professional interests in the Lark are significantly impaired by the FWS's refusal to list the Lark as endangered and adoption of a 4(d) rule that paves the way for the Lark's further decline towards extinction rather than helping to recover the Lark as required by the law. The FWS's actions mean that my ability (along with that of other members of the Center) to see and enjoy the Lark in the future have been greatly diminished and that a Court order requiring the Service to revisit these decisions is critical to my future enjoyment and appreciation of this unique bird that exists only in the Pacific Northwest.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 9, 2018

Noah Greenwald

Digitally signed by Noah Greenwald
DN: cn=Noah Greenwald, o=Center for Biological Diversity, ou=Endangered Species Program, email=ngreenwald@biologicaldiversity.org, c=US
Date: 2018.10.09 10:40:45 -07'00'

Noah Greenwald