Eric R. Glitzenstein (D.C. Bar No. 358287) (admitted pro hac vice)
eglitzenstein@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C.  20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Nick Lawton (Oregon Bar No. 143685)
nlawton@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave., N.W., Suite 210
Washington, D.C.  20016
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Attorneys for Plaintiff

## IN THE UNITED STATES DISRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

—————————————————————

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ) | |
| ) | |
| ) | |
| Plaintiff, ) | No. 3:18-cv-00359-MO |
| ) | |
| v.  ) | REPLY MEMORANDUM IN |
| ) | SUPPORT OF PLAINTIFF'S |
| DAVID BERNHARDT, Acting Secretary, ) | MOTION FOR SUMMARY |
| U.S. Department of the Interior, *et al*., ) | JUDGMENT AND IN OPPOSITION |
| ) | TO DEFENDANTS' AND |
| Defendants. ) | INTERVENORS' MOTIONS FOR |
| ) | SUMMARY JUDGMENT |

—————————————————————

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................ iii

I.    THE SERVICE'S REFUSAL TO LIST THE LARK AS
      ENDANGERED IS CONTRARY TO THE ESA AND
      ARBITRARY AND CAPRICIOUS. ............................................ 2

      A.    DEFENDANTS HAVE NO VALID DEFENSE TO PLAINTIFF'S
            ARGUMENT THAT THE LARK MUST BE LISTED AS ENDANGERED
            BASED ON ITS EXTREMELY DIRE STATUS IN A "SIGNIFICANT
            PORTION OF ITS RANGE." .............................................. 2

            1.    Defendants Have Waived Any Legal Defense Of The SPR
                  Definition Applied In The Lark Listing Decision. ..................... 2

            2.    Defendants' Arguments That The Listing Decision Should Be
                  Sustained Despite Use Of An Unlawful SPR Definition Are
                  Groundless. ............................................................ 4

                  a.    Defendants' Contention That The FWS Made A Threatened
                        Finding Specific To The Washington Portion Of The Range
                        Is An Impermissible Post Hoc Rationalization. ................... 4

                  b.    The FWS's Use Of An Unlawful Definition Of "Significant"
                        Cannot Be Deemed "Harmless Error." ........................... 10

                  c.    Even Under The FWS's Overly Restrictive And Now
                        Vacated SPR Definition, The Washington Portion Of The
                        Lark's Range Would Have To Be Deemed An SPR. ............. 15

      B.    THE FWS's FINDING THAT THE LARK IS NOT ENDANGERED
            IN "ALL" OF ITS RANGE IS ALSO ARBITRARY AND CAPRICIOUS. ....... 17

            1.    The Listing Rule Is Internally Inconsistent With Regard To Whether
                  The Status Of Larks In The Willamette Valley Is Declining Or Stable. .. 17

            2.    The FWS's Discounting Of The Trend Analysis By Its Own
                  Hand-Picked Peer Reviewer Was Arbitrary And Capricious, And
                  Violated The ESA's "Best Available" Science Standard. ............... 19

            3.    The FWS's Finding Of Likely Persistence In The Willamette Valley Is
                  Arbitrary And Capricious For Additional Reasons. ................... 25

Plaintiff's Reply Memorandum In Support Of Summary Judgment

II.    THE 4(D) RULE IS CONTRARY TO THE ESA AND ARBITRARY AND
       CAPRICIOUS. ................................................................................................................30

CONCLUSION ...................................................................................................................................35

Plaintiff's Reply Memorandum In Support Of Summary Judgment

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE**

*Alliance for the Wild Rockies v. Zinke*,
    265 F. Supp. 3d 1161 (D. Montana 2017) ...................................................8

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
    273 F.3d 1229 (9th Cir. 2001) ............................................................25

*Bennett v. Spear*,
    520 U.S. 154 (1997)........................................................................35

*California Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ...................................................10, 11, 14

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971)........................................................................8

*Ctr. for Biological Diversity v. Jewell*,
    248 F. Supp. 3d 946 (D. Ariz. 2017) ...................................................3

*Defenders of Wildlife v. Norton*,
    258 F.3d 1136 (9th Cir. 2001) ...................................................2, 3, 9, 10

*Desert Survivors v. U.S. Dep't of the Interior*,
    321 F. Supp. 3d 1011 (N.D. Cal. 2018) ...............................................3

*Gen. Chem. Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987)...........................................................19

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004), *amended* 387 F.3d 968.........................8, 11, 12, 14

*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) ...................................................22, 29, 30

*Idaho Wool Growers Ass'n v. Vilsack*,
    816 F.3d 1095 (9th Cir. 2016) ...........................................................14

*Kazarian v. U.S. Citizenship and Immigration Servs.*,
    596 F.3d 1115 (9th Cir. 2010) ...........................................................14

*Mach Mining, LLC v. EEOC*,
    135 S. Ct. 1645 (2015)....................................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................32, 35

Plaintiff's Reply Memorandum In Support Of Summary Judgment

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ..............................................................................19

*Nat'l Wildlife Fed'n v. NMFS*,
    184 F. Supp. 3d 861 (D. Or. 2016) ........................................................................8

*Northwest Resource Information Center v. Northwest Power and Conservation*
    *Council*,
    730 F.3d 1008 (9th Cir. 2013) ..............................................................................14

*Organized Village of Kake v. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) (en banc) ..........................................................10, 14

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ................................................................................10

*In re Polar Bear Endangered Species Act Listing*,
    794 F. Supp. 2d 65 (D.D.C. 2011) ........................................................................6

*San-Luis & Delta-Mendola Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................................20

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)........................................................................................12, 13

*Shinseki v. Sanders*,
    556 U.S. 396 (2009)....................................................................................10, 11

*Sierra Club v. EPA*,
    719 F.2d 436 (D.C. Cir. 1983) ............................................................................19

*Singh v. Ashcroft*,
    361 F.3d 1152 (9th Cir. 2004) ................................................................................4

*Tucson Herpetological Soc'y v. Salazar*,
    566 F.3d 870 (9th Cir. 2009) ..........................................................10, 11, 12, 24, 30

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018)................................................................................31, 32

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ................................................................................4

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2) ........................................................................................................4

16 U.S.C. § 1532(6) ......................................................................................1, 2, 5, 6, 9, 14

Plaintiff's Reply Memorandum In Support Of Summary Judgment

16 U.S.C. § 1533(b)(1)(A)..................................................................................19, 20

16 U.S.C. § 1533(d)................................................................................................33

16 U.S.C § 1539(1)(B)............................................................................................33

16 U.S.C. § 1539(a)(2)(A).......................................................................................33

16 U.S.C. § 1539(a)(2)(B)(ii)..................................................................................33

76 Fed. Reg. 76,995................................................................................................15

76 Fed. Reg. 77,002.............................................................................................9, 10

79 Fed. Reg. 37,578, 37,581 (July 1, 2014)............................................................3

Plaintiff's Reply Memorandum In Support Of Summary Judgment

## GLOSSARY

APA – Administrative Procedure Act

AR – Administrative Record

BBS – Breeding Bird Survey

ESA – Endangered Species Act

DOE – Department of Energy

FWS – United States Fish and Wildlife Service

HCP – Habitat Conservation Plan

SPR – Significant Portion of Range

USGS – United States Geological Survey

Plaintiffs' opening brief explained that, according to the Fish and Wildlife Service ("FWS" or "Service") itself, the Streaked Horned Lark ("Lark") has been reduced to as few as 1,170 remaining members of the species; that the Lark's remaining range has drastically contracted from its historic range; that the situation is especially dire in the Washington portion of the remaining range, where only a few hundred Larks still exist and the population continues to plummet; and that the Lark faces a plethora of severe threats throughout its remaining range, including in the Willamette Valley in Oregon. Nonetheless, the FWS unlawfully and arbitrarily concluded that the Lark does not satisfy the definition in the Endangered Species Act ("ESA") of a species that is "endangered" in "all" or even a "significant portion of its range." 16 U.S.C. § 1532(6). Plaintiffs further explained that the Service adopted a "4(d)" rule for the Lark that, far from "conserving" the species as mandated by the ESA, freezes in place a regulatory status quo in the Willamette Valley that the Service itself found to be incapable of preventing the Lark's ongoing deterioration, let alone bringing about its recovery.

In response, Federal Defendants incongruously characterize Plaintiffs' challenge as a "fly-specking of these decisions" and an objection to "only narrow aspects of the agency's decision-making." Federal Defendants' Memorandum ("Fed. Mem.") at 1. In reality, Plaintiffs contend that Defendants have violated the plain terms and paramount purpose of the ESA, flouted Circuit precedents construing the Act, and deprived the Lark of essential legal protections that it urgently needs to avoid extinction. As explained further below, this case raises legal issues of central importance to the proper operation of the ESA rather than mere "second-guess[ing]" of the FWS's exercise of any scientific "judgment." *Id*. at 2.

I.    **THE SERVICE'S REFUSAL TO LIST THE LARK AS ENDANGERED IS CONTRARY TO THE ESA AND ARBITRARY AND CAPRICIOUS.**

Plaintiffs explained that Circuit precedent, as well as the plain language of the ESA, dictates the conclusion that a species must be listed as endangered *either* because it is endangered in "all" of its extant range *or* because it is endangered in a "significant portion of its range." 16 U.S.C. § 1532(6); *see* Plaintiff's Memorandum in Support of Its Motion for Summary Judgment ("Pl. Mem.") at 23-24 (citing *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001)). Plaintiffs further explained that the FWS's statements in the Lark listing rule and the underlying Administrative Record strongly support the conclusion that the Lark is indeed endangered in "all" of its range, *see* Pl. Mem. at 24-30, and that, at the very least, the Service's failure to list the species as endangered based on a "significant portion of its range" ("SPR")— i.e., the Washington portion, where the species is in the direst of straits—must be set aside as contrary to statutory language and Ninth Circuit precedent construing it. *Id*. at 31-36.

Federal Defendants have not effectively rebutted either of these independent grounds for setting aside the FWS's refusal to list the Lark as endangered. Because the government's response to Plaintiff's SPR argument essentially concedes error, and this alone affords a sufficient reason for the Court to remand, Plaintiff addresses that argument first.

A.    **DEFENDANTS HAVE NO VALID DEFENSE TO PLAINTIFF'S ARGUMENT THAT THE LARK MUST BE LISTED AS ENDANGERED BASED ON ITS EXTREMELY DIRE STATUS IN A "SIGNIFICANT PORTION OF ITS RANGE."**

1.    **Defendants Have Waived Any Legal Defense Of The SPR Definition Applied In The Lark Listing Decision.**

Plaintiffs explained that the FWS's approach to the SPR issue cannot be sustained because (1) the FWS's listing decision makes clear that the Lark is, at minimum, endangered in the Washington portion of the Lark's range; and (2) the Service's determination that the

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Washington portion is not a "significant portion" for listing purposes applies a test that renders the SPR language "superfluous" in exactly the manner rejected in *Defenders of Wildlife*, 258 F.3d at 1142, and that has now also been deemed unlawful (and vacated on that basis) by two district courts in the Ninth Circuit. *See* Pl. Mem. at 31-35.

Before turning to how Defendants respond to this argument, it is important to highlight what they do not contest. Defendants do not dispute that the test applied in the Lark listing rule for determining whether a portion of a species' range is "significant"—i.e., whether the loss of that portion would render the species "as a whole" in danger of extinction, AR-632—is the same test that has now been deemed unlawful by other federal courts. To the contrary, Defendants concede that "[t]here is no dispute that FWS applied a definition of 'significant' here that was *identical to the definition set forth in the Draft SPR Policy*." Def. Mem. at 24 n.19 (emphasis added). As previously explained, with no rebuttal from Defendants, that very definition was declared to be unlawful in *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 957-58 (D. Ariz. 2017), in a ruling that Defendants declined to appeal. *See* Pl. Mem. at 33-34. Subsequently, a virtually identical definition of "significant"—adopted in the "final SPR Policy"—was held to be unlawful on essentially identical grounds, in *Desert Survivors v. U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1073-74 (N.D. Cal. 2018). *See* Pl. Mem. at 35.[1]

---

[1] Defendants assert that "Plaintiffs' contention that the subsequent definition of 'significant' in the Final SPR Policy is, with minor variation, the same definition' as the definition in the Draft SPR Policy, *id.*, is wide of the mark." Def. Mem. at 24 n.19. However, when it issued the Final SPR Policy, the FWS itself said that the definitions were only "slightly" different in practical effect. 79 Fed. Reg. 37,578, 37,581 (July 1, 2014). In any case, Plaintiffs agree with the government that the "distinction between these definitions is immaterial here." Fed. Mem. at 24-25 n.19. This is because (as two courts have now ruled) they both "suffer[] from the same fundamental defect," namely, that "[t]he Draft SPR Policy, like the Final SPR Policy, impermissibly renders the [SPR] language of the ESA superfluous by limiting it to situations in which it is unnecessary." *Ctr. for Biological Diversity*, 248 F. Supp. 3d at 959; *see also Desert Survivors*, 321 F. Supp. 3d at 1072 (explaining that the case challenging the

Further, Defendants make no effort to support the *legality* of the SPR definition invoked in the Lark decision. Instead, remarkably, Defendants appear to concede that the FWS "*did use an impermissible definition of 'significant'*" in the Lark's SPR finding. Def. Mem. at 29 (emphasis added). In any case, Defendants have now waived any argument that the definition invoked by the FWS in determining that the Lark is not, at the very least, endangered in an SPR is lawful. *See, e.g.*, *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) (explaining that "arguments not raised by a party in an opening brief are waived"); *Singh v. Ashcroft*, 361 F.3d 1152, 1157 n.3 (9th Cir. 2004) (same).

If elementary principles of judicial review are applied, as they must be, this should be the end of the matter. The APA provides that a reviewing court "shall" set aside and remand agency action that is "not in accordance with law" or is "arbitrary or capricious," 5 U.S.C. § 706(2), and, here, the FWS based its determination that the Lark is not endangered in an SPR on a definition of significance that is not only unexplained in the listing decision, *see* Pl. Mem. at 32, but that Defendants have now elected to abandon in response to Plaintiffs' challenge.

      **2.**      **Defendants' Arguments That The Listing Decision Should Be Sustained Despite Use Of An Unlawful SPR Definition Are <u>Groundless.</u>**

          **a.**      **Defendants' Contention That The FWS Made A Threatened Finding Specific To The Washington Portion Of The Range Is An Impermissible *Post Hoc* Rationalization.**

Defendants contend that Plaintiff's "argument is based on a faulty premise—namely, that prior to applying the definition of 'significant,' the agency 'indisputably found that the Lark is 'in danger of extinction' in the entire Washington portion of its range,' such that this status

---

definition of "significant" in the Final SPR Policy raised the "same question" of statutory construction as the case in Arizona, which rejected the definitions in both the Draft and Final SPR Policies).

Plaintiff's Reply Memorandum In Support Of Summary Judgment

finding, coupled with a positive significance finding for the Washington population, would have compelled FWS to list the entire subspecies as endangered." Def. Mem. at 25 (quoting Pl. Mem. at 31). According to Defendants, the Service's "finding for the Washington population was formulated in terms entirely consistent with threatened status," so that "Plaintiff's underlying premise"—that the Service itself plainly viewed the Washington portion as endangered—is "wholly counterfactual." *Id*. at 27.

This characterization of the listing decision is revisionist history, and cannot be reconciled with the rule's plain terms, the record underlying it, or basic axioms of administrative law. To begin with, Defendants point to nowhere in the rule in which the FWS in fact determined that the *Washington-specific* portion of the range is threatened rather than endangered. To the contrary, both in the SPR finding and elsewhere in the rule, the Service repeatedly characterized the Washington population as one that is indeed "in danger of extinction." 16 U.S.C. § 1532(6). With respect to the Washington portion, the SPR finding explains the "total estimated population" has been reduced to a mere "270-310 birds"; that "[d]emographic modeling using data from these sites uniformly shows *precipitous* population declines"; that the available research "conclude[s] that the Washington population is *declining by 40 percent per year*"; and that "both deterministic and stochastic models to analyze the data . . . projected that, *in all cases*, streaked horned larks *would likely become extirpated in 25 years*," and have already "reached a point where *they are declining towards extinction . . . .*" *Id*. (emphasis added).[2]

---

[2] Government counsel's efforts to distance the FWS from these dire assessments, *see, e.g.*, Def. Mem. at 20 n.16 (asserting that the references to a population rapidly nearing extinction were "not FWS's own finding") is unavailing. Even a cursory review of the rule confirms that the Service was presenting them as the best available science on the extremely bleak status of Larks in Washington. *See, e.g.*, AR-632 ("Demographic modeling using data from these sites *uniformly shows precipitous population declines*") (emphasis added); AR-623 ("Estimates of population growth rate[] that include vital rates from all of the nesting areas in

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Put more colloquially by one of the principal authors of the listing rule, the best available data demonstrate that the Lark in Washington is rapidly "going to hell in a handbasket." AR-8558, 8559; *see also* Pl. Mem. at 8 n.2 (reproducing table from study cited by the FWS, reflecting that the "[m]edian time to extinction" for the Statewide population of Larks in Washington is only 17 years, with a *100% extinction probability* at 25 years); AR-593 (referring to the "rapidly declining population on the south Puget Sound"); AR-615 (explaining that the "[Lark] population decline in Washington indicates that . . . the subspecies may *disappear from that region in the near future*") (emphasis added).[3]

In contrast, as to Larks in the Willamette Valley, the SPR finding says that the "best available information does not suggest that they are likely to experience significant declines in the foreseeable future, to the degree that *this population* would be considered in danger of extinction at the present time . . . which leads us to conclude that the subspecies *is threatened in the Willamette Valley*." *Id.* (emphasis added). In context, the Service's reference to "*this population*" is plainly designed to contrast the Willamette population with the far graver (i.e., endangered) status of the Washington population.[4]

_____

Washington . . . *indicate* that streaked horned larks *are declining by 40 percent per year*, apparently due to a combination of low survival and fecundity rates") (emphasis added).

[3] Consequently, Defendants' assertion that the FWS found that "any risk of extinction for the Washington population was not imminent" and may not occur "at all," Def. Mem. at 27, is erroneous. Defendants selectively emphasize the FWS's use of the phrase "within this century" to describe the extinction risk, *id.* (quotation omitted), implying that the Service found that extinction may not occur until the *end* of the century. Nothing in the rule (or the record) supports that implication. To the contrary, the Service's dire description of a population that has been reduced to only a few hundred birds and that is "declining by 40 percent per year," AR-632, is the paradigm of a population that is "in danger of extinction." 16 U.S.C. § 1532(6); *see also In re Polar Bear Endangered Species Act Listing*, 794 F. Supp. 2d 65, 83 (D.D.C. 2011) (setting forth the FWS's view that "endangered" status applies to a "class of species experiencing both a severe range reduction and/or precipitous population crash combined with ongoing threats").

[4] That the Washington portion of the range is in fact endangered and was regarded by the FWS as such is also overwhelmingly supported by the scientific literature in the record. *See, e.g.*,

Given these findings as to the relative status of the Washington and Oregon populations, it is evident that FWS applied its unlawful definition of "significance" to the Washington portion of the range because declaring that population to be *non*-significant was the *only* possible way for the agency to determine that the Lark is not endangered in "all" *or* a "significant portion" of its range. The ultimate SPR finding makes this crystal-clear, stating that:

> [w]e considered whether the threats may be so concentrated in some portion of its range that, *if that portion were lost, the entire subspecies would be in danger of extinction.* In applying this test, *we determined that even with the potential loss of the Washington populations,* the relatively larger, population in the Willamette Valley of Oregon would likely persist; *therefore the subspecies as a whole is not presently in danger of extinction, and therefore does not meet the definition of an endangered species under the Act.*

AR-632 (emphasis added). This finding, applying a legal test Defendants have declined to defend in this Court, makes no sense (and, indeed, would have been entirely pointless) unless the FWS had indeed found that the "Washington population" is in "danger of extinction" but that its loss would not render the "subspecies as a whole" in such danger. *Id.*

The only reasonable reading of the SPR finding (and the only one that could plausibly be reconciled with the record), therefore, is that the Service found that (1) the Washington portion

---

AR-16582 (2010 article stating that the Lark in Washington is a "critically endangered species" and that "[d]ramatic declines in grassland habitat have pushed the lowland Puget population *to the brink of extinction*, with projected population losses at 40% per year") (emphasis added); AR-20998 (2010 Lark survey by the Washington Department of Fish and Wildlife stating that lark populations are "declining by approximately 40% per year" and that "[t]his trend appears to be driven by combined effects of low fecundity and survival" and that the "*risk of losing the remaining Washington populations is high*, exacerbated by the loss of nesting and foraging habitat due to development at key locations") (emphasis added); AR-21766-80 (publication by Pearson stating that the Washington Lark population is "declining rapidly" due to myriad factors, and that "there appears to be a *high probability that [Lark] populations will be extirpated from this region in the near future*") (emphasis added); AR-22395, 22414-19, 22422 (publication by Schapaugh explaining that the population "models" for the Washington population "predicted a continuing statewide population decline and near certain risk of extinction over the next 25 years" and concluding that "[c]learly, the subpopulations in WA are in grave danger" and that "extinction could be imminent, due simply to the inconsistencies of the environment").

Plaintiff's Reply Memorandum In Support Of Summary Judgment

of the range, which has been reduced to a few hundred birds and verges on extinction, is

endangered; (2) the Willamette Valley portion, due to its purported relative "stability," is

threatened; and (3) for listing purposes, the Washington portion does not qualify as an SPR based

on the definition of that phrase deployed in the rule but that has now been rejected by other

courts in the Ninth Circuit and that the government elected not to defend in this case. *See* AR-

601 ("[w]e do not consider the subspecies *in its entirety* to be in danger of extinction at this time,

as we anticipate the persistence of the [Lark] in *some* portions of its range, at least for the

foreseeable future") (emphasis added). Consequently, Defendants' insistence that the FWS

specifically found that the Washington portion of the range is only threatened—a finding that is

nowhere to be found in the Service's SPR analysis—is the quintessential "post hoc

rationalization" of government counsel on which the Court may not rely to sustain the decision.

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004)

("nor are we to accept the FWS's post hoc rationalizations because such explanations provide an

inadequate basis for judicial review" of FWS decisions), *amended* 387 F.3d 968 (citing *Citizens*

*to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971)).[5]

---

[5] Defendants misleadingly cite *Nat'l Wildlife Fed'n v. NMFS*, 184 F. Supp. 3d 861, 869 n.8 (D. Or. 2016), for the proposition that an endangered species is one that must be "at the brink of extinction now." Def. Mem. at 27. That case did not even address any ESA listing issue at all, let alone analyze the distinction between endangered and threatened status. A case that *has* recently looked at the issue held that the "on the brink of extinction" formulation has never been adopted by the FWS as a "formal binding interpretation of the ESA" with the "force of law," and hence was entitled to little if any deference. *Alliance for the Wild Rockies v. Zinke*, 265 F. Supp. 3d 1161, 1179 (D. Montana 2017). The court also held that the "interpretation of 'in danger of extinction' to mean 'on the brink of extinction' is not consistent with the agency's prior interpretation of 'endangered species' under the ESA," and represented a change in approach for which the FWS had never supplied a "reasonable explanation." *Id.* at 1179-81. In any event, in this case, the Lark listing rule characterizes the tiny and rapidly vanishing Washington population as one that *is* on the precipice of extinction.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Equally groundless is Defendants' argument that there is a "fundamental flaw in Plaintiff's [SPR] argument." Def. Mem. at 27. Defendants set forth no coherent explanation of any such purported "flaw." They instead assert that:

> [b]ecause FWS initially determined that the rangewide status of the subspecies was threatened, then subsequently determined as part of its status prong analysis that the Washington population was also threatened, there was no possible basis for the agency to list the entire subspecies as endangered—irrespective of the significance prong. *See* 76 Fed. Reg. at 77,002 (explaining that FWS is "limit[ed] . . . to the question of whether the species is in danger of extinction in a significant portion of its range' when a species is 'threatened throughout all of its range,' and 'if <u>not</u>, [the agency's] lists the species as <u>threatened</u>.). Put otherwise, regardless of the outcome of the significance prong analysis for the Washington population, FWS's rangewide and status prong findings meant that there was <u>no</u> possible route to endangered status for the subspecies.

Def. Mem. at 27 (emphases added).

If this confusing statement is simply a recapitulation of Defendants' contention that the FWS, in its SPR analysis, made a specific determination that the Washington population is only threatened, and hence the Service had no need to address the significance issue, as we have explained, this contradicts the SPR finding as well as the Service's discussion of the best available science concerning the Washington population. If Defendants are arguing something else, Plaintiff is at a loss to understand what. Defendants certainly cannot maintain that, *irrespective* of the FWS's finding regarding the status of the Washington population, "there was <u>no</u> possible route to endangered status for the subspecies." Def. Mem. at 28. Any such argument would flout the plain language of the ESA—which requires listing a species as "endangered" when it is "in danger of extinction throughout all *or a significant portion of its range*," 16 U.S.C. § 1532(6) (emphasis added)—as well as the ruling in *Defenders of Wildlife* that the SPR

language must be "give[n] effect" as an independent basis for listing. 258 F.3d at 1142

(quotation omitted).[6]

> ### b. The FWS's Use Of An Unlawful Definition Of "Significant" Cannot Be Deemed "Harmless Error."

Defendants also contend that "[e]ven if FWS did use an impermissible definition of

'significant,' Plaintiff cannot show that this alleged error was harmful." Def. Mem. at 29. This

position is also devoid of substance. For one thing, there is nothing that is merely "alleged" about

the legal error Plaintiff has identified. Plaintiff demonstrated in its opening brief that the

definition cited and applied in the Lark rule is unlawful under binding Circuit precedent, and

Defendants opted not to defend the definition's legality.

As for whether the conceded error was "harmless," the Ninth Circuit has "stressed . . .

that a court 'must exercise great caution in applying the harmless error rule in the administrative

rulemaking context.'" *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090

(9th Cir. 2011) (quoting *Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005)). Accordingly,

the "required demonstration of prejudice is 'not . . . a particularly onerous requirement.'"

*Organized Village of Kake v. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc)

(quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). The Court of Appeals has repeatedly

"held that the harmless error doctrine 'may be employed only when a mistake of the

administrative body is one that *clearly had no bearing* on the procedure or the substance of

decision reached.'" *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 880 (9th Cir. 2009)

---

[6] If Defendants are arguing that even a finding that the Washington portion of the range is endangered *and* significant would still not be sufficient to support an endangered listing, that would also conflict with the Draft SPR Policy in effect at the time the Service made the Lark listing. *See* Def. Mem. at 27 (conceding that, under the Draft SPR Policy, if a species was found to be endangered in an SPR, it was required to be listed as endangered even if it was deemed to be threatened "throughout all of its range'") (quoting 76 Fed. Reg. at 77,002).

Plaintiff's Reply Memorandum In Support Of Summary Judgment

10

(quoting *Gifford Pinchot*, 378 F.3d at 1071); *see also California Wilderness Coal.*, 631 F.3d at

1090 ("We have applied this definition of harmless error—'clearly had no bearing on the

procedure used or the substance of decision reached'—in a number of cases over the last

eighteen years").[7]

Applying these principles in ESA cases, the Ninth Circuit has rejected harmless error

arguments that are functionally identical to the one advanced here. In *Tucson Herpetological*

(cited by Defendants at 28), the Court of Appeals held that the FWS had, in part, based a listing

decision on an erroneous finding of "persistence." 566 F.3d at 880. Because the finding of

persistence was a "key" part of the agency's refusal to list, the court could not

> readily say that the erroneous finding clearly had no bearing on the Secretary's ultimate
> decision to withdraw the proposed listing. On remand, the [FWS] may be persuaded that,
> absent reliable evidence of population persistence, the lizard's lost historical range is
> indeed significant.

*Id*.

In *Gifford Pinchot*, the Ninth Circuit held that the FWS's regulatory definition of the

phrase "adverse modification" of critical habitat was unlawful, and then rejected the argument

that the Service's invocation and application of the unlawful definition in several Biological

Opinions could be discounted as harmless error. 378 F.3d at 1071-75. Explaining that, in the

Biological Opinions under review, the "FWS must be presumed to have followed" the ESA

regulation that the Court of Appeals rejected, the court held that the "critical habitat analysis [in

the Opinions] is therefore irredeemably flawed" and had to be remanded for further analysis

based on a valid regulatory definition of the relevant statutory term. *Id*. at 1075.

---

[7] In *California Wilderness Coalition*, the Ninth Circuit specifically rejected an argument that
the Supreme Court's ruling in *Shinseki v. Sanders* (cited by Defendants at 29) conflicted
with the Court of Appeals' longstanding approach to defining harmless error as that which
"clearly had no bearing on the procedure used or the substance of decision reached." 631 F.3d at
1090-92.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

The same result must be reached here. As in *Tucson Herpetological*, the Court cannot "readily say" that the FWS's invocation of a definition of "significant" that the FWS has declined to defend "clearly had no bearing" on the FWS's refusal to list the Lark as endangered based on its status in the Washington portion of the range. 566 F.3d at 880. Further, "[o]n remand, the [FWS] may be persuaded that, absent" application of its unlawful approach to the SPR issue, the Washington portion of the range is indeed "significant" and, hence, the Lark's extraordinarily vulnerable status there warrants listing as endangered. *Id*.

Likewise, as in *Gifford Pinchot*, Defendants' argument that the FWS's express reliance on an unlawful regulatory definition had no bearing on the outcome makes no legal or logical sense. In effect, Defendants argue that although the FWS invoked and applied its definition of "significance" in the Lark SPR analysis, the Court should view this as merely a make-work exercise of no practical relevance to the "substantive outcome." Def. Mem. at 29 ("That is, irrespective of how FWS defined 'significant,' the substantive outcome for the subspecies . . . would remain exactly the <u>same</u>."). But this is same mode of reasoning rejected in *Gifford Pinchot* as contrary to elementary principles of administrative law (to say nothing of common-sense). *See* 378 F.3d at 1071.

Not only does *Gifford Pinchot* instruct that the Service "must be presumed to have followed" the definition of significance that the agency included in the Lark decision, 378 F.3d at 1071, but Defendants' contrary argument depends on the same false premise that infects their other SPR arguments: that the FWS made a "finding" of "threatened" for the "portion-specific status of the Washington population." Def. Mem. at 29. Once again, Defendants can cite to no such finding in the agency's SPR analysis, and the Court must review the FWS's actions in view of the "grounds ... upon which the record discloses that its action was based." *SEC v. Chenery*

Plaintiff's Reply Memorandum In Support Of Summary Judgment

*Corp.*, 318 U.S. 80, 87 (1943). In any case, the reason why there is no such finding in the rule seems obvious: the Service in fact recognized that the miniscule Washington population is not only endangered, but critically so, and hence it *had* to include and apply its definition of "significance" in order to reach a negative SPR determination. That construction of the rule is far more sensible, and far more consistent with basic principles of administrative law, than the government's post hoc assertion that the FWS's invocation of its definition of significance was actually intended to have no legal or practical import.

That the inclusion of the significance definition was not mere happenstance is also confirmed by the administrative record, which demonstrates that it was precisely *because* of the dire status of the Washington portion of the range that the FWS found it necessary to address whether that portion should be deemed significant. As explained by one of the listing rule's authors, in the course of developing the rule, "[w]e have determined that the status in Washington is clearly awful" and therefore "[n]ext *we need to determine if Washington is a significant portion of the range of the streaked horned lark*." AR-8559 (emphasis added). At that point in the agency's decision making process, the Service incorporated its unlawful definition of significance, finding that because the "loss of all of the larks in Washington would probably not" result in *all* Larks "becom[ing] extinct within the foreseeable future"—i.e., Washington is not the "fulcrum upon which the fate of the subspecies rests"—"therefore Washington is not a significant portion of the range" for the purposes of an SPR determination notwithstanding the fact that it "represents a *substantial portion of the current range of the subspecies* . . . ." *Id.* (emphasis added). Thus, the record confirms that the Service did not include the significance discussion as an academic exercise, but did so because it was integral to the SPR finding.

Under these circumstances, the FWS's application of an "impermissible definition of 'significant,'" Def. Mem. at 29, cannot, consistent with Circuit precedent, be deemed "harmless," because the definition clearly had an important, if not dispositive, bearing on the Service's finding as to whether the Lark is endangered "in a significant portion of its range." 16 U.S.C. § 1532(6); *see also Organized Village of Kake*, 795 F.3d at 969 (holding that the "absence of a reasoned explanation" for a new agency finding regarding the impact of exempting a national forest from roadless rule protections was "not harmless error"); *Northwest Resource Information Center v. Northwest Power and Conservation Council*, 730 F.3d 1008, 1020-21 (9th Cir. 2013) (holding that a power plan's unexplained cost estimate of measures to conserve fish and wildlife was not harmless error, and explaining that "[h]armless error is more readily abused [in the administrative rulemaking context] than in the civil or criminal context"); *California Wilderness Coalition*, 631 F.3d at 1092 (holding that the Department of Energy's ("DOE") failure to comply with a legislative mandate to provide states affected by a DOE decision with certain data was not harmless error, including because the Court had "substantial doubt as to whether DOE would have made the same findings had it consulted with the affected States").[8]

---

[8] The cases cited by Defendants do not remotely resemble the situation here. They instead involve hypertechnical procedural violations that had no possible bearing on the outcome of the agency decision under review. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (holding, in a National Environmental Policy Act case, that one agency's alleged failure to obtain information from another agency was harmless when the relevant information "had already been amply communicated, and the Forest Service and the public already had considered it"); *Kazarian v. U.S. Citizenship and Immigration Servs.*, 596 F.3d 1115, 1122 (9th Cir. 2010) (holding that an applicant for a visa was complaining of harmless error when, in light of the relevant criteria, any error "'clearly had no bearing' on either 'the procedure used or the substance of the decision reached'") (quoting *Gifford Pinchot*, 596 F.3d at 1122).

Plaintiff's Reply Memorandum In Support Of Summary Judgment

      **c.**      **Even Under The FWS's Overly Restrictive And Now Vacated SPR Definition, The Washington Portion Of The Lark's Range Would Have To Be Deemed An SPR.**

Finally, the fact that the Court cannot presume that the FWS would reach the same conclusion on remand, regardless of the definition of "significant" that is applied, is underscored by the Service's own (now-vacated) approach to the SPR issue. As explained in Plaintiffs' opening brief, in the Draft SPR Policy that concededly used an SPR definition "identical" to the one in the Lark decision, Def. Mem. at 24 n.19, the FWS proffered, as an example of a range portion that *should* be deemed an SPR, a scenario that mirrors this case: where a species has "two main populations," one of which is facing "severe threats" to its continued existence and the other is "so small or homogeneous that a stochastic (i.e., random, unpredictable, due to chance) event could devastate the area and the population inhabiting it." Pl. Mem. at 35 (quoting 76 Fed. Reg. at 76,995).

That scenario (which *also* describes a species that is endangered in "all" of its range and hence supports listing for that reason as well, *see* Pl. Mem. at 29; *infra* at 27), encapsulates the Lark predicament precisely: the tiny and rapidly disappearing Washington portion of the range is indisputably facing "severe threats" to its continued existence, and the only other portion of the range, in the Willamette Valley, is, according to the Service itself, exposed to the kind of deadly stochastic event described in the Draft SPR Policy. *See id.*; AR-626 (Lark listing rule explaining that the concentration of the wintering population of Larks in the Willamette Valley is at risk from "*potentially disastrous stochastic* events, such as ice storms or flooding, that could kill individuals or destroy limited habitat; *a severe weather event could wipe out a substantial percentage of the entire subspecies*") (emphasis added); *id.* ("the small and declining population of streaked horned larks is *certainly at risk of random environmental events that could have*

*catastrophic consequences*") (emphasis added). The fact that even the FWS's own, overly restrictive approach to defining an SPR fits the facts of this case reinforces that a remand could well yield a finding by the agency the Lark should be listed as endangered.

Defendants' response is that the "example [in the Draft SPR Policy] is inapt" because the "FWS evaluated the threat of stochastic weather events to the Willamette Valley population and determined that this risk was non-imminent." Def. Mem. at 29 n.23. But Defendants cite to nowhere in the final rule (or anywhere else) in which the FWS said that the risk is "non-imminent" and any such characterization would be insupportable. *By definition*, a stochastic weather-related event is "random" and inherently unpredictable, *see* Webster's Third New International Dictionary (1993), so that it could occur without warning this winter, next winter, or at any other time in the future. That is true of the example of an SPR set forth in the Draft DPS Policy, and is equally true of the predicament facing the Lark as described in the listing rule. *See* AR-625 (rule explaining that the "small, isolated nature of the remaining populations of the . . . [Lark] increases the subspecies' vulnerability to stochastic (random) natural events" and that "[w]hen species are limited to small, isolated habitats, they are more likely to become extinct due to a local event that negatively affects the population").[9]

In sum, the FWS's application of an approach to the SPR issue that contravenes the ESA and Circuit precedent, and that the government has elected not to defend in this case, is not harmless. This alone compels entry of summary judgment for Plaintiff and remand of the listing decision to the FWS.

_____

[9] The fact that the FWS has not "documented the occurrence of these [stochastic weather] threats *to date*," Def. Mem. at 29 n.23 (emphasis added) (quoting AR-626) hardly means that they are "non-imminent," especially in an era of a rapidly changing climate. *See* AR-623 (explaining that "[s]cientific measurements spanning several decades demonstrate that changes in climate are occurring, and that the rate of change has been faster since the 1950s").

Plaintiff's Reply Memorandum In Support Of Summary Judgment

**B.    THE FWS's FINDING THAT THE LARK IS NOT ENDANGERED IN
<u>"ALL" OF ITS RANGE IS ALSO ARBITRARY AND CAPRICIOUS.</u>**

While Defendants' anemic response to the SPR issue makes it unnecessary for the Court

to address the alternative statutory basis for listing as endangered—that the Lark is in danger of

extinction in "all" of its range—Defendants' arguments on that issue are also without merit.

Plaintiffs' opening brief set forth several grounds for challenging the FWS's premise of

"persistence" in the Willamette Valley, which was crucial to the Service's decision not to list as

endangered. Pl. Mem. at 24-29. Defendants have not effectively rebutted these arguments.

**1.    The Listing Rule Is Internally Inconsistent With Regard To Whether
<u>The Status Of Larks In The Willamette Valley Is Declining Or Stable.</u>**

With respect to Plaintiff's argument that the listing rule is internally inconsistent

regarding the status of the Willamette Valley population, *id*. at 24-25, Defendants argue that

"Plaintiff infers too much, creating a contradiction where none exists" because Plaintiff's

"comparison of statements fails to account for differences in the time frames addressed by

FWS." Def. Mem. at 10. According to Defendants, the listing rule's reference to a declining

population only concerned a "<u>long-term</u> decline" based on the "historical trend," whereas the

references to the population being "stable" concerned the "<u>near-term</u> trend for the population."

Def. Mem. at 10 (emphasis in original).

Defendants' asserted distinction does not hold up under scrutiny. The final rule's

references to population decline are not merely "historical" but, rather, clearly refer to present,

ongoing, and future declines. The rule unequivocally states that "streaked horned larks in the

Willamette Valley *are declining*"—present tense—albeit at a slower pace than the even more

rapidly declining Washington population. AR-632 (emphasis added). In fact, when a commenter

on the proposed rule "stated that the [Lark] does not deserve special protection in Oregon . . .

Plaintiff's Reply Memorandum In Support Of Summary Judgment

citing [the FWS's] statements about the apparent stability of the population in the Willamette

Valley" and contending that "the Service failed to demonstrate that the [Lark] is declining or that

such declines are likely to occur," AR600-601, the Service rejected that proposition:

> *Our response*: Our analysis of the best scientific and commercial data available indicates that the [Lark] *is declining throughout its range.* The decline is most apparent in the Puget lowlands of Washington, but the *population in Oregon is also declining,* though at a less pronounced rate.

AR-601 (emphasis added); *see also* AR-622 (referring to the Lark's "downward trend *across its*

*range*") (emphasis added). The rule also clearly predicts *future* population declines in the

Willamette Valley, "conclud[ing]" that "Oregon State regulatory mechanisms are inadequate to

protect the . . . [Lark] *from further population declines associated with habitat loss or*

*inappropriate management*," and that the "[l]ack of essential habitat protection under State laws

leaves [the Lark] at *continued risk* of habitat loss and degradation in Washington *and Oregon*")

(emphasis added). *See also* AR-597 ("we agree that the [Lark] has declined *and may be*

*continuing to decline*" in the Valley" (emphasis added); AR-601 ("conclud[ing] that Oregon's

Statewide planning goals and guidelines . . . are not sufficient to protect or maintain habitat on

agricultural lands for the long-term sustainability of streaked horned lark populations").

   In short, Defendants' contention that the rule's references to declines in the Willamette

Valley only relate to "historical" trends is fallacious. The rule unmistakably refers to a

population that is *now* declining and will *continue* to do so in view of ongoing threats and

inadequate protections. Yet in the very same the rule, the FWS states that the population in the

Willamette Valley "is stable" and "would likely persist" in the absence of the Washington

population—a finding that is vital to the agency's decision to list the Lark as threatened rather

than endangered. AR-632. Because "stability" is the opposite of "declining," *see* Webster's

Third World New Int'l Dictionary (defining "stable" as "durable" and "unvarying"), and

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Defendants' effort to explain away the "internal inconsistency" fails, this affords another compelling basis for a remand for more coherent decisionmaking. *See Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141, 1145 (9th Cir. 2015) (explaining that an agency's "internally inconsistent analysis is arbitrary and capricious" and holding that a "seeming inconsistency" in EPA's explanation for a cost-effectiveness finding under the Clean Air Act was, "absent explanation, 'the hallmark of arbitrary action.'") (quoting *Sierra Club v. EPA*, 719 F.2d 436, 459 (D.C. Cir. 1983)); *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (finding agency analysis arbitrary and capricious because it was "internally contradictory and inadequately explained").[10]

### 2. The FWS's Discounting Of The Trend Analysis By Its Own Hand-Picked Peer Reviewer Was Arbitrary And Capricious, And Violated The ESA's "Best Available" Science Standard.

Plaintiff explained that the Service's discounting of the new data and analysis in the Altman peer review—a review that the FWS solicited precisely because of Altman's longstanding expertise in the Lark—was arbitrary and capricious, violated the ESA's requirement that listing decisions be based "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), and conflicts with Circuit precedents mandating reliance on the best "available" data even if it is not as definitive or conclusive as the agency would prefer. *See* Pl. Mem. at 25-27. In response, Defendants argue that so long as the

---

[10] Defendants' attempt to reconcile the internal inconsistency by arguing that the FWS was *only* referring to stability "in a relative sense"—i.e., as contrasted with the Washington population, Def. Mem. at 11—also falls flat. While the Service did say that the Willamette Valley population is "more stable" than the Washington population, *id.*, it did not *only* say that. It also said that the "apparent trend of the subspecies in the Willamette Valley *is stable*" and "would likely persist," AR-632, while simultaneously finding that the very same population is "declining." *Id.* This is an "internal inconsistency" that at least necessitates further explanation. *National Parks Conservation Ass'n*, 788 F.3d at 1145.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

FWS did not entirely "ignore" Altman's new analysis of the Breeding Bird Survey ("BBS") data bearing on the status of the Lark in the Willamette Valley, then it complied with the statute. Def. Mem. at 12 (quotation omitted).

However, the ESA does not simply require the FWS to familiarize itself with the available data. Rather, it imposes an affirmative decision making standard by requiring that the FWS "*shall* make determinations [on the listing of species] *solely on the basis of* the best scientific and commercial data available to [it] after conducting a review of the status of the species . . . ." 16 U.S.C. § 1533(b)(1)(A) (emphasis added). Consequently, while it is correct that the agency need not rely on scientific evidence that it "disagrees with or discredits," *San-Luis & Delta-Mendola Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014)—so long as it adequately explains the basis for its disagreement—if the evidence at issue is indeed the best available, notwithstanding any limitations, the Service cannot refuse to make its listing determination "on the basis of" that information. 16 U.S.C. § 1533(b)(1)(A).

In this case, the FWS did *not,* contrary to Defendants' characterization, "disagree[] with" the BBS data evaluated by the Service's own expert peer reviewer. Def. Mem. at 13 (quotation omitted). In fact, Defendants concede that the FWS's own biologists were "'not intimately familiar with BBS data,'" *id.* at 17 (quoting AR-1316), and hence were in no position to disagree with Altman's analysis of the data or his conclusion that they cannot be reconciled with any assumption of stability in the Willamette Valley. *See* AR-15076 (Altman's detailed explanation that the "roadside BBS data . . . indicate[] substantial declines," and that the BBS data "strongly bring[] into doubt the rationale for considering the lark as Threatened rather than Endangered").

According to Defendants, the FWS's own admitted lack of "familiar[ity]" with the BBS data "prompt[ed] agency biologists to seek additional input from *others* with 'expertise [in] the

analysis of BBS data." Def. Mem. at 17 (emphasis added) (quotation omitted). Defendants do not

explain why the Service even found it necessary to take this step rather than accept the analysis

of its own hand-selected peer reviewer—who *does* have "expertise [in] the analysis of BBS

data," which is why it was brought to the agency's attention after being overlooked in the

proposed rule. *See* AR-1315-17. Indeed, the whole point of the Service's peer review process

resulting in *Altman's* analysis is to "*ensure the best biological and commercial information is*

*being used* in the decisionmaking process as well as *to ensure that reviews by recognized experts*

*are incorporated into the review process*." AR-27024 (emphasis added).

  In any case, John Sauer, the individual selected by the Service to "peer review the peer

review," AR-171, also did not "disagree" with the data presented by Altman or his analysis of

those data. As the government concedes, "[a]s relevant here, Dr. Sauer found <u>generally</u> that the

Altman comments 'correctly describe[ed] the patterns of population change shown from BBS

data.'" Def. Mem. at 17 (quoting AR-1318). Indeed, in parts of his review that the government

elides, Sauer specifically stated that Altman had "engaged in a reasonable use of the data" and

that he knew of no additional data that Altman had failed to consider or that could "potentially

alter the outcome" of Altman's conclusion that the Willamette Valley population is in fact

declining at a significant rate. AR-1314; *see also* AR-593 (listing rule citing *Sauer* for the

proposition that the "BBS data . . . show that [Larks] in this [Bird Conservation Region] *have*

*been declining since 1960s, with an estimated annual trend of -4.6%*) (emphasis added).

  As Defendants point out (and as recognized in Plaintiff's opening brief, at 18), Sauer did

note a higher "level of uncertainty" in the BBS data than Altman, Def. Mem. at 17, and Sauer

"qualified his conclusion" regarding the validity of Altman's analysis "with several caveats

related to the limitations of the BBS data." *Id*. But that is not the same as saying that the data,

Plaintiff's Reply Memorandum In Support Of Summary Judgment

notwithstanding their limitations, are not the "best available" regarding overall trends in the

Willamette Valley. The record reflects no disagreement at all between Altman and Sauer as to

*that* question, which is the critical one insofar as the ESA's decision making standard is

concerned. *See* AR-15076 (Altman's explanation that the BBS information constitutes the "best

data set" available and indicates substantial population declines"); *id.* (explaining that the BBS

data "should carry much greater weight in assessment of trends than the [Oregon Fish and

Wildlife ("ODFW")] data because of the annual and temporal quality of the BBS data").

As explained in Plaintiffs' opening brief (at 28), the Court of Appeals, applying the best

available science standard, has specifically held that it is arbitrary and capricious "for the Service

to simply invoke 'scientific uncertainty'" as the basis for a decision to deny a species the ESA

protections that would otherwise be warranted. *Greater Yellowstone Coal., Inc. v. Servheen*, 665

F.3d 1015, 1028 (9th Cir. 2011). But that, in effect, is exactly what the government argues for

here, by emphasizing Sauer's "caveats" rather than his bottom-line concurrence that Altman

"correctly describe[d] the patterns of population change"—i.e., substantial *declines* in the

Willamette Valley over many years—based on the best available data. AR-1318.[11]

Defendants' contention that the FWS is not required to "accept the best available science

uncritically," Def. Mem. at 15, inverts the analysis required by the ESA. Engaging in critical

---

[11] Defendants argue that *Greater Yellowstone* is not "to the contrary" because in that case
the "agency relied on uncertainty regarding the impact of a potential threat as the basis for
concluding that there was no such threat," whereas in this case "FWS sought only to account for
the limitations of a particular data set in determining how much weight to give an interpretation
of that data." Def. Mem. at 19. That is a distinction without a difference. The "data set" at issue
here—reflecting whether the Willamette Valley population is stable or declining—was
fundamental to the Service's listing decision in view of the many threats found by the Service.
And in "[a]ccounting for the limitations of a particular data set" by opting to afford the data *no
weight whatsoever* in the listing determination, the Service did exactly what the Ninth Circuit
held it cannot do: invoke uncertainty in the best available data to the detriment of the species.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

analysis to determine *what constitutes* the best available science is one thing. But once that determination is made, the Service may not then refuse to rely on the best available data because it has limitations. The government concedes as much, acknowledging that it "*is appropriate* to consider even 'imperfect' information, provided it is the best available." *Id*. (emphasis added). Here, however, the FWS ultimately refused to afford the Altman data and analysis *any* consideration in its ultimate determination of whether the Lark warranted listing as endangered or threatened, and it did so based on an erroneous standard: *not* because the Service's own expert peer reviewer's data and analysis failed to reflect the best *available* science on the overall trend of the Willamette Valley population (as they did), but, rather, because they were deemed "not '*sufficiently* reliable to alter [the FWS's] *conclusion regarding the status of the subspecies*.'" Def. Mem. at 18 (emphasis added) (quoting AR-597).

      However, "sufficiently reliable to alter" the "conclusion" the agency had reached *before* it received the peer review—i.e., when the Service had *proposed* listing the Lark as threatened based on the assumption of stability and persistence in the Valley—is not the decision making standard mandated by the ESA or the Circuit precedent applying it. Even putting aside the seeming result-orientation embodied in Defendants' own characterization of how the Service went about addressing the Altman peer review, the crucial point is that the FWS never explained why the review, notwithstanding any limitations, did not reflect the best *available* science. The government's acknowledgement that the Service instead applied a far more rigorous standard— requiring that previously unconsidered data be "sufficiently reliable" to overcome the agency's preexisting "conclusion"—compels a remand for application of the correct legal standard. *See also* AR-597 (concession in the listing rule that Altman's analysis "presents a more complete

Plaintiff's Reply Memorandum In Support Of Summary Judgment

picture of the status of the subspecies" in the Willamette Valley than the Service had previously considered).[12]

The FWS's refusal to rely on its own peer review expert's data and analysis was particularly egregious because Altman's finding of a significantly declining trend in the Willamette Valley is actually far more consistent with the Service's assessment of the myriad threats facing the Lark than the counterintuitive (and internally contradictory) assertion of population stability and persistence the agency relied on. As explained, the Service found that Larks "in the Willamette Valley face many of the same threats as populations in Washington," including ongoing habitat loss and degradation, AR-633, and that existing protections in Oregon are "inadequate to protect the . . . [Lark] from further population declines associated with habitat loss or inappropriate management . . . ." AR-622.

If, as the Service found, there are multiple threats and inadequate safeguards, then the "pattern of population declines rather than stability" discerned by Altman, AR-15076, is exactly what one would expect. Yet rather than accept the data and analysis that best comport with the agency's own description of the predicament facing the Lark in the Willamette Valley, the Service insisted on adhering to its preexisting "conclusion" of population stability and persistence. This is arbitrary and capricious decision making even apart from the agency's failure

---

[12] Defendants' assertion that "courts have faulted agencies for <u>not</u> accounting for such limitations," Def. Mem. at 15 n.12 (citing *Tucson Herpetological*), is misleading, especially in the context of ESA listing decisions. In *Tucson Herpetological*, the Court of Appeals faulted the Service for "affirmatively rely[ing] on ambiguous studies" to *deny* ESA protection for a species on the grounds that the studies constituted "evidence of persistence (i.e., stable and viable populations)." 566 F.3d at 879. The court held that "[i]f the science on population size and trends is underdeveloped and unclear, the [FWS] *cannot reasonably infer that the absence of evidence of population decline equates to evidence of persistence*." 566 F.3d at 879 (emphasis added). This ruling strongly supports Plaintiff's position in this case, in which the Service inferred population stability, notwithstanding extensive contrary evidence proffered by the agency's own peer review expert.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

to abide by the ESA's best available science standard. *See, e.g., Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (explaining that an agency decision is arbitrary and capricious when it fails to "articulate[] a rational connection between the facts found and the choice made").

### 3.    The FWS's Finding Of Likely Persistence In The Willamette Valley Is Arbitrary And Capricious For Additional Reasons.

Plaintiffs explained that, even if the Service was justified in discounting the Altman peer review, which it was not, the Service's finding of likely persistence of the Willamette Valley population, while simultaneously acknowledging serious threats to, and inadequate protection of, that same population, was arbitrary and capricious and in conflict with Circuit precedent. Pl. Mem. at 28-30. Defendants' responses are meritless.

First, Defendants make the peculiar argument that, while the Service acknowledged various threats, specifically in the Willamette Valley, it did not say that they will "cause[] <u>actual</u> impact to the species." Def. Mem. at 20 (quotation omitted). That assertion conflicts with the plain terms of the rule. For example, the rule finds that development in the Valley "will" cause severe impacts to the Lark and its habitat. AR-608. According to the rule:

> [a]bout 96 percent of the Willamette Valley is privately owned, and it is both the fastest growing area in Oregon and the most densely populated . . . The population projected for 2050 is approximately 4 million, or nearly double the current population. *The increase in population will result in increased building construction and road development, further imperiling the remaining prairies . . . .*

*Id.* (emphasis added). The rule also specifically finds that the ongoing decline of grass seed fields in the Willamette Valley "will" continue to adversely affect the Lark because:

> [g]rasslands—both rare native prairies and grass seed fields—are important habitats for [Larks] in the Willamette Valley: open areas with the grasslands are used for both breeding and wintering habitat . . . The continued decline of the grass seed industry in the Willamette Valley *will result in fewer acres of suitable breeding and wintering habitat for [Larks] . . . .*

Plaintiff's Reply Memorandum In Support Of Summary Judgment

*Id.* (emphasis added). In addition, the listing rule finds that there are "many other ongoing threats to [the Lark's] habitat *throughout its range*," including "[c]onversion to agriculture and industry"; "loss of natural disturbance processes, such as fire and flooding"; "encroachment of woody vegetation"; and "incompatible management practices." AR-615. The rule finds these "current and ongoing threats to [Lark] habitat *are resulting in a significant impact to the subspecies and its habitat and will continue into the future*." *Id.* (emphasis added); *see also* AR-632 (explaining that Larks "in the Willamette Valley *face many of the same threats as populations in Washington*") (emphasis added). Accordingly, the government's suggestion that the FWS did not identify any threat in the Valley that "causes <u>actual</u> impacts to the species" or any "significant" impacts, Def. Mem. at 20, is specious.

The listing rule also finds that the "existing regulatory mechanisms" in Oregon are "inadequate to reduce threats" to the Lark "now or in the future," and that "Oregon State regulatory mechanisms" are "inadequate to protect [the Lark] from further population declines associated with habitat loss or inappropriate management." AR-622; *see also id.* (explaining that the "lack of essential habitat protection under State laws leaves [the Lark] at continued risk of habitat loss and degradation . . . in Oregon"). Where, as here, the Service concluded that (1) there are many "significant" threats that "will" significantly harm Larks and their habitat *in the Willamette Valley*, and (2) existing protections are inadequate to address those very threats, the Service's Pollyannaish prediction that the Willamette Valley population nonetheless "would likely persist," Def. Mem. at 22 (quoting AR-632), is arbitrary and capricious in the same manner as other unsubstantiated and unreasonable FWS forecasts of species persistence that the Court of Appeals has rejected. *See* Pl. Mem. at 29-30 (citing cases).

26

Plaintiff's Reply Memorandum In Support Of Summary Judgment

As previously explained, in addition to the significant adverse impacts that the Service *knows* will take place in the Valley, the Service's finding of population stability and "likely" persistence is also impossible to reconcile with the agency's dire assessment that a "substantial percentage" of the *entire* wintering Lark population could well be wiped out by a single "severe weather event" so that the "small and declining population of [Larks] is *certainly at risk of random environmental events that could have catastrophic consequences.*" AR-626 (emphasis added). Once again, the government's response—that the risk of such an event is "non-imminent," Def. Mem. at 23—is a *non sequitur* because, by definition, a "random" weather event could occur in any year in the future (at least in the absence of evidence demonstrating that it is more likely to occur at some time rather than another). *See supra* at 15-16. Here, Defendants have cited nothing from the rule that suggests that the "catastrophic" scenario it highlighted is "non-imminent."[13]

Nor is there any validity to the government's claim that what it characterizes as "near-term data" establish that "'the apparent trend . . . in the Willamette Valley is <u>stable</u>,'" Def. Mem. at 21 (quoting AR-632). Even aside from statements in the rule itself that the trend is *not* stable, *e.g.*, AR-632 (stating that the best available data "suggest that [Larks] in the Willamette Valley *are declining*)" (emphasis added), and peer reviewer Altman's findings that the Lark population is in fact significantly declining, the rule admits that, in contrast to the Washington portion of the

---

[13] Instead of citing anything from the rule, the government cites to a Washington Department of Fish and Wildlife document, which simply says that such stochastic events have "not yet occurred." AR-21604. The same document, however, describes habitat loss and other impacts as posing "imminent," "high" magnitude threats to Larks in the Willamette Valley, and it defines "high magnitude" threats as those that are "likely to reduce the overall population, decrease the reproductive potential of the population, or significantly decrease the area used for foraging and breeding. *These changes are likely to lead to extinction, local extirpation, or significant declines in local populations.*" *Id.* (emphasis added). This contradicts Defendants' contention that the Valley population is "stable" and "likely to persist."

Plaintiff's Reply Memorandum In Support Of Summary Judgment

range, "no population modeling has been done using data from Oregon." AR-632. Consequently,

while conceding myriad ongoing and future threats—including a progressive loss and

degradation of nesting and breeding habitat—the rule contains no projections for what the

population will likely be, e.g, in five, ten, or twenty years, as the habitat continues to degrade

(especially in the absence of *any* regulatory protections).

Even a modest downturn in a population that has already been reduced to 1,000 birds or

fewer, *see* AR-632, could have devastating implications for the survival of the species in Oregon

as well as Washington. As explained by the Service itself:

> [p]opulations that are small, fragmented, or isolated by habitat loss or modification of
> naturally patchy habitat, and other human-related factors, *are more vulnerable to
> extirpation by natural, randomly occurring events, to cumulative effects, and to genetic
> effects that plague small populations, collectively known as small population effects.*
> These effects can include genetic drift (loss of recessive alleles), founder effects (over
> time, an increasing percentage of the population inheriting a narrow range of traits), and
> genetic bottlenecks leading to increasingly lower genetic diversity . . . .

AR-622 (emphasis added); *see also* AR-623 ("Genetic analysis has shown that [Larks] have

suffered a loss of genetic diversity due to a population bottleneck, the effect of which may be

exacerbated by continued small population size.").

Defendants' reliance on what they characterize as "the available near-term data" to

establish "likely persist[ence]," Def. Mem. at 21, 22, is fatally flawed for additional reasons.

First, Defendants have provided a one-sided presentation of the data they cite. Defendants rely

on a comparison of ODFW survey data from 1996—which were gathered and analyzed by peer

reviewer Altman, *see* AR-21346—and from 2008. *See* Def. Mem. at 21.[14] Defendants neglect to

---

[14] As explained, Altman, who conducted the 1996 survey cited by the government,
informed the FWS that the BBS data far better reflected the actual status of the species. *See
supra* at 22. The OFDW employees who analyzed the 2008 surveys also identified various
"*limitations* in study design [that] affected analysis and interpretation of the data." AR-21348

mention, however, that the same surveys found that Lark population numbers "decreased in the

northern Willamette Valley," which is an "essential component to the conservation of these

sensitive grassland birds," AR-21355, 21357, 21364, and the study authors concluded that:

> [h]abitat loss and conversion, disturbances, low reproductive output and population
> isolation continue to exert serious pressure on existing populations, leading to further
> fragmentation of existing populations and *vulnerability to extirpation should conditions
> continue on a similar trajectory.*"

AR-21355 (emphasis added).[15]

More important, even if Defendants had described the so-called "short-term" trend data

in an even-handed manner, as Plaintiff explained, *see* Pl. Mem. at 29-30, the Ninth Circuit has

foreclosed the FWS's reliance on such data as a "rational" basis for finding likely species

persistence *in the future*. *Greater Yellowstone,* 665 F.3d at 1026. In *Greater Yellowstone*, the

Service argued that an emerging threat to one of the grizzly bear's food sources (whitebark pine)

would not adversely affect the bear's population in the future, and it relied for that argument on

the fact that the population had "*increased* over the past three decades . . ." *Id.* (emphasis added).

The Court of Appeals, however, held that "[i]t is not rational for the Service to rely on grizzly

---

(emphasis added). Yet Defendants place stock in these surveys notwithstanding such
"limitations," while dismissing the more comprehensive BBS survey data due to "limitations."

[15] Defendants paint a misleading portrait of the record in other ways. For example,
Defendants cite a "table" purportedly "showing a change in the total number of [Larks]
territories on surveyed public lands in the Willamette Valley from 22 in 2005 to 227 in 2008."
Def. Mem. at 22 (citing AR-21197). In reality, as the cited report makes clear, the sites were only
"exhaustively surveyed in *2006 through 2008*," AR-21152 (emphasis added), so the comparison
with 2005 data, as cited by the government, is meaningless. *See also* AR-21197 (reflecting the
absence of survey data for most sites in 2005). Further, the author of this study, Randall Moore,
is the same scientist whose assistance was solicited by the FWS for help "in describing the lark's
population trends in Oregon," and who responded by saying that "*we have no population trend
data for Oregon.*"AR-6241 (emphasis added). (Plaintiff's opening brief mistakenly referred (at
30 n.15) to Moore as a scientist with ODFW rather than a faculty member in the Department of
Fish and Wildlife at Oregon State University, whose surveys were conducted "with USFWS
funds." AR-21109, 21150. Plaintiff's counsel apologizes for that mistake, which has no
substantive bearing on Plaintiff's argument).

Plaintiff's Reply Memorandum In Support Of Summary Judgment

trend data" from the past "in order to predict the effect on the grizzly population of an overall whitebark pine tree *decline*." *Id*. at 1027. Likewise, here, the FWS has provided no rational reason for why the very small Willamette Valley population will "persist" and remain "stable" in the future notwithstanding the serious, ongoing threats to the Lark's habitat conceded in the listing rule. *See also Tucson Herpetological*, 566 F.3d at 879 (holding that, in the face of multiple threats to a species' habitat, the "FWS cannot reasonably infer that the absence of evidence of population decline equates to the evidence of persistence").[16]

## II.    THE 4(D) RULE IS CONTRARY TO THE ESA AND ARBITRARY AND CAPRICIOUS.

Plaintiff explained that, even if the FWS had properly found that the Lark is threatened rather than endangered, a rule issued pursuant to section 4(d) for a threatened species must provide for the "conservation," i.e., recovery, of the species. Pl. Mem. at 37. Plaintiff further explained that the blanket 4(d) rule adopted for agricultural lands—which exempts from the ESA's take prohibition all "agricultural (farming) practices consistent with State laws," without

---

[16] Defendants' argument that these rulings "are distinguishable," Def. Mem. at 22 n.17, actually serve to reinforce why they compel judgment for Plaintiff. Defendants say that, "[i]n each of these cases, a court [i.e., the Ninth Circuit] found that an agency [i.e., the FWS] erred in making a finding of persistence where the agency lacked any data showing stability." *Id*. As explained, however, in *Greater Yellowstone*, the FWS relied on data showing population "*increase[s]*," 665 F.3d at 1026 (emphasis added), and that was *still* insufficient to demonstrate a rational basis for why the population would persist in the future. *Id.* In *Tucson Herpetological*, the "FWS relied on population studies to conclude that the lizard 'is persisting,'" while conceding that the information relied on was "'limited and inconclusive.'" 566 F.3d at 878 (quotation omitted). That is the same situation here, in which the FWS conceded that "[w]e do not have conclusive data on population trends throughout the [Lark's] range," AR-593, and, specifically, that "no population modeling has been done using data from Oregon." AR-632. In fact, the Service's finding of persistence is far more "unreasonable" and arbitrary than those in *Greater Yellowstone* or *Tucson Herpetological*, 566 F.3d at 879, because, in contrast to those cases, the Service here could not even arrive at its own consistent conclusion as to whether the *current* Willamette Valley population "is stable" or "declining." AR-632.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

any measures to protect nesting and breeding larks—cannot reasonably be classified as a rule designed to facilitate the recovery of the Lark. *Id*. at 40.

Neither Federal Defendants nor Defendant-Intervenors have come to grips with Plaintiffs' arguments. Rather, they spend most of their 4(d) arguments on matters not at issue. Plaintiff does not dispute that the ESA affords the FWS "flexibility" in crafting 4(d) rules. Def. Mot. at 31; Brief of Intervenors at 12-13. Nor does Plaintiff dispute that, in appropriate circumstances, the FWS may "allow[] for the take of a threatened species as part of a special rule without running afoul of the 'conservation' language in ESA section 4(d)." Def. Mem. at 31.

Rather, the precise issue in *this* case is whether the administrative record supports the conclusion that a 4(d) rule that does nothing at all to improve the status for Larks on agricultural lands in the Willamette Valley will in fact facilitate the recovery of the Lark, when the listing decision issued along with the 4(d) rule finds that merely maintaining the current situation will *not* allow the Lark to recover. As the Supreme Court recently reaffirmed, the fact that the ESA "confers discretion" on the FWS does not mean that it may insulate its exercise of that discretion from meaningful judicial review. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018) (holding that although the FWS was vested with discretion in the designation of critical habitat, judicial review was available to consider the "familiar" claim in "administrative law that the agency did not appropriately consider all of the relevant factors that the statute set forth to guide the agency in the exercise of its discretion"); *id*. at 370 ("As we explained recently, 'legal lapses and violations occur, and especially so when they have no consequence. That is why this Court has long applied a strong presumption favoring judicial review of administrative action.'") (quoting *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1652-53 (2015)).

Plaintiff's Reply Memorandum In Support Of Summary Judgment

The administrative record here contradicts the conclusion that the blanket 4(d) rule for agricultural practices is a conservation/recovery rule. As Plaintiff explained, with no rebuttal by the government or intervenors, the listing rule expressly finds that the agricultural practices and the regulation of them in the Willamette Valley "are *not sufficient* to protect or maintain habitat on agricultural lands for the long-term sustainability of streaked horned lark populations." AR-601 (emphasis added). In addition, the Service found that "[b]ased on our review of Oregon State regulatory mechanisms" (i.e., the same "mechanisms" that are incorporated into the 4(d) rule),"we conclude that they are *inadequate to protect the . . . [Lark] from further population declines associated with habitat loss*"—such as conversion of grasslands to uses incompatible with Lark presence— "or *inappropriate management*." AR-622 (emphasis added); *see also id*. ("*Lack of essential habitat protection under State laws* leaves [the Lark] at continued risk of habitat loss and degradation in . . . Oregon") (emphasis added).

Given these findings that the *very same state regulatory practices* that are incorporated in the 4(d) rule are "inadequate to protect" the Lark, it was not at all "reasonable for FWS to conclude that its special rule would further conservation of the species." Def. Mem. at 35. Indeed, neither the government nor intervenors even attempt to reconcile the conflict between the listing rationale and the 4(d) rule. Nor do they venture an explanation as to how the identical treatment of agricultural lands under State law that was deemed so "inadequate" that  federal protection was necessary, could somehow be transmogrified into a regulatory approach that will help the Lark not only to survive, but to recover. This is the epitome of arbitrary and capricious decision making. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made").

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Rather than explain how the codification of admittedly deficient State regulation (which allows both Larks and their habitat to be destroyed with impunity) will help the Lark recover, the government attempts to shift the Court's attention to *other* ESA "tools" that may play a role in species conservation. Def. Mem. at 39 (citing AR-597). There are two problems with that tactic. First, the ESA does not say that a 4(d) rule may subvert the recovery of a species so long as the Service may attempt to use other measures to accomplish the Act's objectives. Rather, the plain language of the statute mandates that the *4(d)* rule *itself* be "necessary and advisable to *provide for the conservation of such species*." 16 U.S.C. § 1533(d) (emphasis added).

Second, the blanket 4(d) rule has also undermined the other "tools" alluded to by Defendants. For example, the government refers to "habitat conservation plans" without explaining what they are. Def. Mem. at 39. A "habitat conservation plan"—or "HCP" in ESA vernacular—is a plan adopted by a private landowner to obtain FWS authorization to engage in the "incidental" taking of a listed species (e.g., through routine agricultural practices). *See* 16 U.S.C. §§ 1539(a)(2)(A), (B). The HCP must (among other things) "to the extent practicable, minimize and mitigate the impact of such taking," and ensure that the "taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id* §§ 1539(a)(2)(B)(ii), (iv).

Although well-crafted HCPs certainly *could* have assisted with the conservation of the Lark in the Willamette Valley, the Service's blanket 4(d) rule completely nullified that prospect. Under the ESA, the *only* reason for any landowner to prepare and submit an HCP for FWS approval is to obtain the Service's authorization for a particular amount of "take," provided that the Service makes the requisite findings concerning the impact of the take on the species and the value of the "conservation" plan. 16 U.S.C § 1539(1)(B). Yet the sweeping 4(d) rule adopted by

Plaintiff's Reply Memorandum In Support Of Summary Judgment

the Service, which *categorically* provides that each and every killing, injuring, or other form of "take" of a Lark on agricultural lands—*regardless* of the overall impact on the species' survival or recovery, or how practicable it might be for a landowner to minimize or mitigate adverse impacts—obliterates any useful role for HCPs on the lands covered by the rule.

Ironically, therefore, the Service's reference to other "tools" highlights the irrationality of the 4(d) rule. Defendants claim that it somehow "incentivize[s]" landowners to conserve Larks, Def. Mem. at 38, but by rubber-stamping an admittedly unacceptable status quo of State regulation in the Willamette Valley, the rule does no such thing. While it is certainly true that agricultural producers may continue to "*inadvertently* create habitat for the [Lark]," *id.*, this would have been the case regardless of whether *any* 4(d) rule was promulgated. Indeed, it would have been the case regardless of whether the Lark was ever listed under the ESA. Hence, declaring that Lark "conservation" has somehow been "incentivized" through a rule that literally changes *nothing* on-the-ground—and that does not even ask producers to avoid destroying Lark habitat, or to make even the slightest of changes in their practices in an effort to safeguard actively nesting and breeding Larks—is a distortion of language as well as logic.

Most important, what the FWS has never explained is why it did not endeavor to craft a 4(d) rule that *would* "incentivize" actual Lark conservation in an equivalent manner to the HCP mechanism referenced by the government, e.g., by conditioning the 4(d) exemption on *some* measures for minimizing impacts on breeding and nesting Larks. This is what the Service's own peer reviewers, including Altman, urged the agency to do, *see* Pl. Mem. at 13, and, once again, the Service's own listing decision stresses that the inadvertent creation of Lark habitat, as in the Willamette Valley, is only of long-term conservation value to the Lark *if* steps are taken to avoid or minimize mowing over or trampling occupied nests. *Id.* at 20.

34

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Defendants' response is that "'imposing a timing restriction would likely reduce the utility of the special rule *for land managers*, and *could* have the unintended side effect of causing landowners to discontinue their habitat creation activities." Def. Mem. at 38 (citing AR-598) (emphasis added). But that rank speculation is unsupported by *any* concrete evidence regarding, e.g., the actual overlap between the timing of various agricultural practices and the time frames when it is most vital to protect Larks; what incremental costs on business operations would actually be imposed by some basic Lark protections; and what impacts, if any, those costs would actually have on the profitability of farming in the Willamette Valley and the land use decisions made by land managers. In the absence of such information, the Service is left with nothing but "speculation or surmise," *Bennett v. Spear*, 520 U.S. 154, 169 (1997), that conditioning the 4(d) rule on basic measures designed to protect Larks during crucial nesting activities would result in the wholesale abandonment of the practices that incidentally help create habitat Larks can use.

In sum, a rule that sets in stone an admittedly unacceptable regulatory status quo is, by definition, not a "conservation" rule. In addition, the Service's speculative rationale for avoiding any measures to safeguard imperiled Larks during the breeding season is unsupported by any concrete record evidence, and hence is arbitrary and capricious for that reason as well. *See State Farm*, 463 U.S. at 43.

## **CONCLUSION**

The Court should enter summary judgment for Plaintiff, and order the relief set forth in Plaintiff's opening brief. *See* Pl. Mem. at 40.

Plaintiff's Reply Memorandum In Support Of Summary Judgment

Respectfully submitted,

/s/Eric R. Glitzenstein

Eric R. Glitzenstein
Admitted Pro Hac Vice
eglitzenstein@meyergliz.com

/s/Nick Lawton

Nick Lawton
Oregon Bar No. 143685
nlawton@meyerglitz.com

Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C.  20016
(202) 588-5206

Counsel for Plaintiff

36

Plaintiff's Reply Memorandum In Support Of Summary Judgment